DeCICCO, Senior Judge:
A general court-martial composed of officer and enlisted members convicted the appellant of the premeditated murder of his wife in violation of Article 118, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 918, and sentenced him to be put to death. The convening authority approved the sentence.
This appeal was originally referred to a panel of the Court that issued three published opinions on separate issues. United States v. Thomas, 33 M.J. 644 (N.M.C.M.R. 1991) (denying petition to compel a government-funded psychosocial investigation), United States v. Thomas, 33 M.J. 768 (N.M.C.M.R.1991) (denying motion for an order to the Judge Advocate General of the Navy to provide funds to hire a “death-qualified” appellate defense counsel), and United States v. Thomas, 39 M.J. 626 (N.M.C.M.R.1993) (denying relief for alleged instructional and procedural errors during the sentencing hearing). We subsequently decided to hear the case en banc. The appellant has raised 89 issues for our review and he has submitted voluminous matters personally pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A.1982).
Having considered the record of trial, the briefs of the parties, and the matters submitted by the appellant, we have completed our review under Article 66, UCMJ, 10 U.S.C. § 866 (1994). We agree unanimously to affirm the findings of guilty. After extensive deliberation and debate, however, we are deadlocked by a four-to-four vote as to whether the finding of one of the two aggravating factors was factually correct. Senior Judges ORR, MOLLISON, and REED and Judge CLARK concur that the prosecution proved both aggravating factors alleged in this case. The Chief Judge, Senior Judge WELCH, Judge KEATING and I agree that the prosecution did not prove the aggravating factor that the murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim. Judge McLAUGHLIN is not participating in this case due to his prior involvement in the case as appellate government counsel. Nevertheless, even without one of the two aggravating factors, the four of us who have found factual inadequacy have concluded that the death sentence should still be affirmed. Our separate views on this issue follow, but we are unanimous in affirming the findings and, except for Senior Judge MOLLISON, the sentence as well.

Factual Background

In the early morning hours of 10 December 1987, the charred remains of the appellant’s wife, Melinda, were discovered by civilian police officers. Her remains were found in a burned Suzuki Samurai jeep, registered to the appellant, which was located at the bottom of a 60-foot ravine off the Ortega Highway in southern California. This road is a winding, mountainous road leading east into the mountains from near the Marine Corps Air Station, El Toro, where the appel *560 lant was stationed. The crash site was located about a 45-minute drive from the base. Except for the burning, the Suzuki sustained minimal damage in the crash, and the fuel tank remained intact. Melinda’s burned body was found in the driver’s seat with the seat belt buckle latched. The seat belt itself was burned away. In the initial death certificate, the coroner determined the cause of death to be suicide.
After further investigation, however, it was determined that Melinda’s death was neither an accident nor a suicide. Police investigators determined very early the lack of any evidence to support the accident theory. The roadway contained no evidence of skid marks or braking. The police did locate tire tracks in the soft-dirt shoulder of the road at a ninety-degree angle to the road. These tracks, which were of the same width as the wheels of the Suzuki, continued over the edge of the cliff and immediately along the top of the slope all the way to the bottom of the ravine. Casts of the tracks were not taken because the fire had consumed the Suzuki’s tires, leaving only the rims. Police determined from this evidence that the vehicle was never airborne and that it must have gone over the cliff at a very slow rate of speed. An investigator opined that the Suzuki was pushed or rolled over the cliff.
Further evidence shed doubt on the suicide theory. The pathologist who performed the autopsy on Melinda’s remains testified that her larynx and tracheobronchial tree, while containing some blood, were free of soot on the mucosal surface, meaning Melinda never inhaled any smoke. From this, he determined that she was already dead at the time the fire started. He found no evidence of any heart disease or any other sickness that might have killed her and that she was three months pregnant with a male fetus. He concluded that trauma injuries were the cause of death. The fact that Melinda was buckled into her seat added further doubt that she may have killed herself. Ultimately, county authorities issued a revised death certificate listing the cause of death as homicide.
Another pathologist testified for the prosecution. He did not examine the remains, but he did study the reports, x-rays and photos. He found multiple fractures on the left side of the skull, which he believed were cranial blunt force injuries caused by a curved surface. He did not think they were injuries from the crash. The trauma had a curved impression which made a repeating scallop form. He estimated that Melinda was struck on the skull between four and seven times. He also found that she had incurred a fractured nose. He stated that her survival time after receiving such injuries would have been between 20 and 45 minutes.
The appellant and Melinda were married in March 1987. The appellant was previously married and had a daughter, Mary, by the prior marriage. He was granted custody of Mary, and he, Mary and Melinda lived in government housing at Marine Corps Air Station, Tustin, near the El Toro base.
Shortly after marrying Melinda, the appellant added a rider to his life insurance policy which insured Melinda for $50,000. Mr. Hammer, the insurance agent, testified that it was his idea to add the spousal rider to the policy, and the appellant agreed to do so. The policy contained a standard suicide clause which provided that if an insured committed suicide within 2 years of the issue date, the insurance company’s liability under the policy was limited to the amount of premiums paid less any indebtedness.
The evidence at trial established that the appellant did not enjoy a harmonious relationship with Melinda. Witnesses testified that they heard them argue. The appellant was heard to complain about marital problems while he was at work. One witness stated that he heard the appellant say several times that he would have to “get rid of’ Melinda. When this witness suggested marriage counselling or divorce, the appellant either did not reply or, on one occasion, said, “It wouldn’t serve my purpose.” Another witness related that the appellant was upset with Melinda for gaining weight, not doing housework, and taking his money. This witness also said that the appellant became aware of a note the witness had received from Melinda in which she told the witness she would like to get him alone, strip his clothes off, and “make love to [him] like [he] has never had it before.”
*561 There was also testimony that Melinda was a drug abuser and was behind in paying for her drugs. An exhibit presented at the Article 32, UCMJ, 10 U.S.C. § 832 (1994), pretrial investigation reflected that Melinda had 71 nanograms per milliliter of cocaine and/or metabolites in her system at the time of her death. The appellant himself had stated that Melinda had problems with alcohol and other drugs. In September 1987, both Melinda and he became undercover informants for the Naval Investigative Service [NIS], but although certain transactions were attempted, none was successful. NIS terminated their role as informants in late October 1987.
The events leading up to Melinda’s death began on 8 December 1987, when she became upset with the appellant because he had his hair cut very short in a style known as a “high and tight.” That evening, Melinda went out with friends to play pool and have a few drinks. When she returned home, matters went from bad to worse, resulting in a fight with the appellant and the summoning of the police. Both military and civilian police officers responded. As a result, the appellant was escorted out of his home and had to spend the night in the barracks.
On the morning of 9 December, Melinda visited the appellant’s command to complain of his conduct from the previous evening. The appellant was brought in, and he requested to go to the base legal office to obtain information on divorce. He was allowed to do so. The appellant also went to the Family Service Center and told a counsellor about his fight with Melinda. He also told the counsellor he was concerned for his daughter’s welfare and that he thought Melinda was unfit to care for her.
Sergeant [Sgt] Young testified under a grant of immunity. He related that shortly after noon on 9 December, he had a conversation with the appellant at work. Young complimented the appellant on his “high and tight” haircut, and the appellant stated that it had caused problems at home because his wife did not like it. After discussing car repairs for a short time, the appellant asked Young how much it would cost to kill someone. Young estimated it would cost $10,000. The appellant then asked if the price would be the same if there were a $100,000 life insurance policy out, and Young replied affirmatively. The appellant wondered how it could be done without being detected. Young mentioned an intravenous injection of air, which the appellant rejected. The appellant then brought up the idea of staging a vehicle accident by “putting a bomb under the gas pedal, some gas cans in the trunk, and pushing it over a cliff.” Next, they spoke of using some dynamite Young had stolen from the Marine Corps base at Twentynine Palms. Young declined this idea because he planned to use the stolen dynamite to go “bass busting” in Tennessee. Melinda’s name never came up in the conversation. Young thought the conversation was strange, and he did not take it seriously. Nonetheless, he did mention it to a friend who indicated he needed the money.
Mr. Mitcheal Nelson, a former lance corporal and friend of the appellant, was the central witness for the prosecution. He also testified pursuant to a grant of immunity. Nelson testified that prior to Melinda’s death, the appellant confided in him about the marital problems he was having. The appellant spoke to him of killing Melinda and mentioned a phosphorous bomb connected to the accelerator of the Suzuki. Nelson asked if a divorce might be a better idea, and the appellant told him that “it wouldn’t suit [his] purpose.”
Nelson stated that the appellant told him three times during November that Melinda was ruining his life, that he needed to get rid of her, and that he would pay money from the life insurance policy to accomplish it. He said the appellant made a similar statement to him again on 9 December at work. That weekend, Nelson said he had a date and was renting a car for the date. After work on Wednesday, 9 December, the appellant went with Nelson to a car rental agency and inexplicably gave Nelson $100 to help pay for the car. The rental car was not due back until the following Sunday.
At about 1900 hours on 9 December, Nelson arrived at the appellant’s house. The appellant suggested that they visit a neighbor’s house for the evening. The appellant asked Melinda if she wanted to join them, *562 but she said she wanted to sleep. The appellant told Nelson that Melinda had packed her things and was going to leave him. The appellant and Nelson went to the nearby house of the DeLuz family, and there they were joined by a Corporal Howard. Nelson testified that, except for Howard, they each drank one or two beers, but no one was intoxicated. During the course of the evening, the appellant left several times to check on Melinda.
According to Nelson, the gathering at the DeLuz residence broke up between 2400 and 0030 hours when he, Mrs. DeLuz, and the appellant adjourned to the carport outside the appellant’s home, where they talked for a few minutes. Both Nelson and Mrs. DeLuz specifically recall the appellant’s Suzuki being parked in the carport at that time. After Mrs. DeLuz returned home, the appellant invited Nelson into his house. Nelson sat at the dining room table. The appellant went to the rear area of the house where the bedrooms were located.
At this point, Nelson testified that he heard noise coming from the bedroom area and heard Melinda say, “Please don’t hit me, stop hitting me, I love you,” and “Please don’t kill me.” Nelson went back to the bedroom and saw the appellant sitting on top of Melinda on their waterbed. The appellant was holding a tire iron in his hand. Although the light in the bedroom was not lit, Nelson said he was able to see well enough because of a light from the nearby bathroom. Nelson said it looked like Melinda’s nose was broken and blood was everywhere. Nelson testified he recalled Melinda then say, “Please stop hitting me; I won’t tell anyone.” The appellant responded with another blow to her head. Melinda stopped moving and said nothing more. Nelson dove toward the bed in an effort to stop the appellant, but he was unsuccessful. The appellant raised the tire iron above Nelson, but Nelson rolled off the bed onto the floor. The appellant then hit Melinda four or five more times with the ratcheted end of the tire iron. Nelson thought the appellant had the tire iron in his right hand.
Nelson said that the appellant then got off the bed and turned on the bedroom light. He had blood all over his hands, face and clothes. He told Nelson that it was messier than he thought it would be, and he asked Nelson to help clean up. He offered Nelson $10,000 of the insurance money as an incentive for Nelson to help dispose of the body. The appellant asked for the keys to Nelson’s rental car, a Buick, which was parked outside. When Nelson asked why, the appellant said they were going to put Melinda’s body in the trunk, drive it and the Suzuki up to Ortega Highway, put Melinda’s body in the Suzuki, and push it over a cliff.
Nelson assisted the appellant in cleaning up the blood, which was all over the room. Nelson rolled Melinda’s body up in the comforter on the bed and heard a gurgling noise from her. The appellant said “Don’t worry, she’s dead; it’s just nerves.” They moved the body to the playroom and finished cleaning the bedroom. The appellant’s daughter, Mary, was asleep in another bedroom across the hall. The appellant checked on her a few times while cleaning up his wife’s blood. They loaded Melinda’s body and other items (clothes, linen, the tire iron, and a fishing gaff) into the trunk of the Buick, and they left in the two vehicles for the Ortega Highway.
When they found a suitable location along the highway, they put the body in the driver’s seat of the Suzuki and the appellant buckled the seat belt. The appellant poured gasoline all over the Suzuki, lit a rag to ignite it, and together with Nelson pushed it over the cliff. The Suzuki rolled to the bottom of the ravine, but it did not ignite. The appellant told Nelson to climb down and light it, but Nelson objected. The appellant reminded Nelson about the $10,000 he was paying him. Nelson then climbed down the ravine and lit the Suzuki on fire. They drove back to the base together in the Buick. On the way back to his residence, the appellant told Nelson how much better life would be with the insurance money and even mentioned taking a trip to Las Vegas. The appellant told Nelson that their story would be that the Suzuki was already gone when they left DeLuz’s home. Nelson expressed reservations about this story because Mrs. DeLuz had seen the jeep in the carport, but the appel *563 lant told him not to worry because he thought she knew what was going on. After returning home, the appellant picked up Mary, and they went to Nelson’s apartment for the night, arriving at around 0430.
Subsequently, investigators became suspicious of the appellant when they learned that he was upset with Mrs. DeLuz regarding her recollection that the Suzuki was parked in the carport around 0100 on 10 December. The appellant approached her and attempted to “convince” her otherwise. Mrs. DeLuz testified she told appellant she must have been mistaken just to calm him down. But she knew the Suzuki had been there at that time, and this cast doubt on the stories appellant was telling about Melinda leaving earlier in the evening.
Nelson said he disposed of the other materials the next day by placing them in a dumpster located behind a library in town. He cleaned the blood from the trunk at a car wash, allowing the water to drain from the trunk through some rust holes. The prosecution also presented the testimony of the next person to rent the Buick, who testified that she found the trunk “wet and mucky.” Further investigation disclosed evidence of human blood on the bed frame, the mirror over the bed, and the walls of the bedroom, but the amount of blood was insufficient to determine the blood type.
On cross-examination, the defense established that Nelson had twice lied under oath to NIS when he was questioned about his role in Melinda’s death. At the time he was questioned, he had been arrested for the murder of Melinda Thomas.
The prosecution also called Sgt Reynolds, another one of the appellant’s neighbors, to testify. He recalled that on the night of 9-10 December, he was watching television between 0100 and 0130. He heard loud noises from the appellant’s residence which lasted about a minute and then stopped. He also heard Melinda’s and the appellant’s voices. He looked outside and saw a car parked next to the Suzuki in the driveway. Reynolds remembered telling his wife that it was “weird, Joe downstairs arguing in front of company.” He further testified that it was the next day that his wife was told by the appellant that Melinda had passed away the night before.
On 10 December, the appellant arrived at work appearing tired and haggard. He was approached by Sgt Young. Young told the appellant he had someone who was willing to do the killing they had discussed the day before. The appellant told him to “[f]orget about that.” He then asked his supervisor for the day off because, as he told the supervisor, Melinda had left him, his daughter was sick, and her illness had kept him up all night. Mary’s babysitter testified, however, that when Mary was dropped off the morning of 10 December, she appeared normal. The appellant stated that Melinda had sent him on an errand the night before at about 2045, and when he returned home she was gone.
Later on 10 December, the appellant was summoned back to his command. A representative from the county coroner’s office was there to inform him that Melinda had died. When the appellant was told that the initial indications pointed toward suicide, the appellant disagreed and said Melinda was at her parent’s house. He said he saw her leave the house at about 2000 the night of 9 December with her luggage and Christmas presents in the Suzuki. The appellant showed the coroner’s representative a handwritten note Melinda had composed before she left. It stated:
Dear Joe, I know why you hate me. What’s to love. I’m a bitch. I don’t keep house, and I don’t give you what you need all the time. I just don’t know why you got to continue hurting me. I told you I was going to change, but you’re not coming home proves to me that you just don’t care any more. I sat here all day long on the brink of a nervous breakdown. So, I think I’m going to go to my mom’s and get things straightened out. You care more about your friends than you do me. So, I’m going to mom’s so I can have a stress-free pregnancy. You’re causing me stress and I know it’s affecting my baby.
Following the meeting with the county coroner’s representative, the appellant began to tell several persons differing accounts of what had happened the evening of 9 Decern *564 ber. For example, he related different versions as to where he was when he said Melinda left. To one person, he said Melinda left while he was out on an errand to return a borrowed item; to another that she left while he was out picking up Mary; and to others that she departed while he visited a neighbor or while he was playing cards. He also told others that the reason Melinda was driving on the Ortega Highway was that she was out doing undercover work for NIS, and he said to another that she was taking the Ortega Highway to go to her parents’ house and had an accident on the way. We have taken judicial notice that the Ortega Highway would not be the most direct route for Melinda to have taken to go to her parents’ house, which was located north of Los Angeles in Ventura County. And, as indicated above, at the time of her death, Melinda no longer worked for NIS.
Even more evidence made the appellant’s statements incredible. He said that Melinda left for her parents’ house with her bags and Christmas presents. One would therefore assume that these presents would have been consumed in the fire. Yet, the prosecution established that her parents actually received their presents from Melinda. Aso, two of Melinda’s personalized suitcases were found in her home, as well as other personal clothes and effects (e.g., perfume, wristwatch, and hair curlers) one would have expected her to have taken with her if she had actually left to stay with her parents for a time. A neighbor also noticed a full shoe rack in Melinda’s closet, as well as Melinda’s favorite beige corduroy coat which she would not likely have left behind, especially in December.
While this neighbor was assisting the appellant gather Melinda’s effects, he told her that he hoped the authorities did not rule this a suicide because if they did not, he would be “$50,000 richer.” The life insurance company never paid on the policy. As a result, the appellant had to borrow money and use gratuities to pay for Melinda’s funeral.
On 23 January 1988, the appellant had another conversation with Sgt Young. Young mentioned that it seemed strange that Melinda’s death happened just as they had discussed on 9 December. The appellant told him to keep the matter between them because if it got out, it could cause problems.
The defense theory at trial centered on Nelson as the real killer. There were details which did not coincide with Nelson’s testimony, such as where the rental car was driven when compared with the actual mileage put on the car while in Nelson’s possession, and, that after Melinda’s death, the appellant was not anxious to file the insurance claim right away. Aso, several witnesses, including the Family Service Center counsellor, testified the appellant displayed genuine grief and sorrow over the loss of his wife. They said the appellant cried, and even turned red, and gasped for air. The defense also presented evidence that the appellant is left-handed, and since Melinda’s injuries were to the left side of her skull, it was unlikely that he committed the murder. This evidence was later rebutted by the testimony of Melinda’s mother who stated that the appellant was actually ambidextrous and proud of it.
The defense also presented the testimony of an expert radiologist who disagreed with some of the conclusions of the prosecution’s pathologists. He found no “scalloping” on the skull and said that the injury could have been produced by one blow. The appellant did not testify.
The court members deliberated for 7 hours and unanimously found the appellant guilty. Following the sentencing hearing, they unanimously found two aggravating factors: that the murder was committed for the purpose of receiving money or a thing of value, and that the murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim. Manual for Courts-Martial, United States, 1984 [MCM], Part II, Rule for Courts-Martial [RCM] 1004(c)(7)(C), (I). The members then sentenced the appellant be put to death.
Additional relevant facts are included in the discussion of specific issues. We will address all of the issues as raised by the appellant seriatim. Before doing so, we note that we have reviewed the prior panel decision concerning the voting issues and the *565 consideration of the members’ post-trial affidavits. 39 M.J. at 626. We agree with the panel’s resolution for the reasons stated in its opinion. See also United States v. Loving, 41 M.J. 213, 232-39 (1994).
ISSUE I
THE RECORD DOES NOT ESTABLISH BEYOND A REASONABLE DOUBT THAT APPELLANT IS GUILTY OF PREMEDITATED MURDER.
The appellant has specified ten reasons why the prosecution failed to establish beyond a reasonable doubt that he committed premeditated murder. We find all of them unpersuasive.
Article 66, UCMJ, imposes the duty upon us to determine both the legal and the factual sufficiency of the evidence. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. The test for the latter is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant’s guilt beyond a reasonable doubt. United States v. Turner, 25 M.J. 324 (C.M.A.1987). We have concluded that the evidence at trial was sufficient, legally and factually, to prove the appellant’s guilt of premeditated murder beyond a reasonable doubt, and we ourselves are so convinced.
1. The Accident and Suicide Theories
The appellant’s first argument is that Melinda’s death may have been an accident or a suicide. We have determined it was neither. Accident was ruled out almost immediately by the police investigators at the scene of the conflagration. There were no skid marks or other signs of braking on the road. In an accident, a driver who has driven over a cliff will normally attempt to brake before the crash. If a driver did not brake, one would expect the car to have become airborne at a relative angle from the lane of traffic over the cliff. Here, by contrast, the tire tracks ran constantly over and down the cliff, indicating a slow rate of speed. Also, the tracks went over the cliff at a perpendicular angle to the roadway. These factors obviously rule out an accident.
Although the coroner initially determined that Melinda had committed suicide, there is compelling evidence to indicate otherwise. The most persuasive was the testimony of the pathologist who found no soot in Melinda’s tracheobronchial tree. This indicates she was not breathing at the time of the fire and was therefore dead prior to the crash. Her fatal head injuries could not have been caused by impact in the cab of the jeep, according to the expert testimony. Also, the investigators found that Melinda’s seat belt was in use at the time of the crash. We find it highly unlikely that someone who was attempting to commit suicide by driving over a cliff would first buckle her seat belt.
Nelson testified that they tried to make it look like an accident (as distinguished from a suicide), so Melinda’s body was buckled into the driver’s seat. Also, as we read Melinda’s final note to the appellant, we do not conclude it to be a suicide note, but rather an explanation for her leaving the appellant, for at least a temporary period of time.
Finally, several witnesses testified, based on their acquaintance with Melinda, that she would not kill herself. She was excited about her pregnancy and was looking forward to her first child. The appellant himself repeatedly insisted, for ulterior financial motives, that this was not a suicide. After considering the additional evidence, the coroner amended the death certificate to list the cause of death as a homicide. We agree with his determination.
2. The Reliability of Nelson’s Testimony
The appellant’s next point is that because Nelson’s statement to NIS was given under duress that it is inherently unreliable. Nelson alleged that he made statements to NIS under pressure after he was arrested for Melinda’s murder. However, Nelson testified for the prosecution at trial with the protection of a grant of immunity. He was subject to extensive cross-examination by the defense. Even if he made his pretrial statement under pressure, the members consid *566 ered this alleged factor along with all of the other evidence in the case, and still concluded his testimony was sufficiently reliable. We have also considered it and conclude likewise.
3. The Credibility of Nelson’s Testimony
The appellant argues separately that Nelson’s testimony is not credible on its face. He supports this argument by the following: that the appellant is left-handed; that Nelson should have been able to stop the appellant because he is larger than the appellant; that it was too dark in the bedroom for Nelson to see whether the appellant was hitting Melinda in the skull; that a tire iron is an unlikely weapon of choice; that Nelson’s three versions of the facts undercut his credibility; that Nelson’s actions were those of the murderer and not the accomplice; that the post-trial declaration of the appellant’s third wife (whom he married in March 1988) indicating Nelson told her he may have lied at trial and added “they won’t let me tell the truth;” that the mileage on the rental car does not agree with the mileage Nelson said he drove; that there is a discrepancy in the times related by Nelson in his trial testimony and his testimony at the pretrial investigation; that it is impossible for Nelson to have run down the ravine to ignite the Suzuki due to its steepness; and that Nelson engaged in questionable conduct after the murder such as not attending Melinda’s funeral and not speaking with the appellant.
We have considered these points carefully. But we agree with the Government that they are either explainable or they do not sufficiently affect Nelson’s credibility for us not to believe him. We will not consider any oubof-court or post-trial statements or conduct by Nelson raised after trial because “[i]t is well established that a Court of Military Review’s assessment of appellant’s guilt or innocence for legal and factual sufficiency is limited to the evidence present ed at trial.” United States v. Dykes, 38 M.J. 270, 272 (C.M.A.1993).
We must add that in many other respects, Nelson’s testimony was highly credible because it tied together and corroborated numerous details of the prosecution’s case. For example, Nelson’s testimony that he spoke with the appellant in the carport at about 0100 near the Suzuki Samurai agreed with the testimony of other witnesses who also saw the jeep there at that time. His recollection of Melinda’s crying out during the killing was corroborated by Sgt Reynold’s testimony that he too heard Melinda’s voice during the same time frame related by Nelson. Nelson’s testimony that Melinda had a broken nose and was hit repeatedly in the head was supported by the pathologist’s testimony. This expert examined the x-rays and stated at trial that Melinda’s nose was broken and that she had sustained four to seven blows to the head. Nelson’s testimony that Melinda was beaten on the waterbed was corroborated by the testimony of a serologist who found human blood on the headboard, mirror, and bed frame. Nelson’s recollection of the method of disposal of the body was very similar to the one Sgt Young described as the way the appellant planned to dispose of it. Furthermore, the pathologist’s testimony of the lack of soot in Melinda’s airway shows she was killed prior to the fire, as Nelson described.
For numerous reasons, we find Nelson’s testimony was not incredible on its face. We believe he told the truth at trial, and his testimony helped establish the appellant’s guilt beyond a reasonable doubt.
4. Proof of Financial Motives
The appellant’s next argument involves his lack of motive to kill his wife by burning the Suzuki because he had let his car insurance policy lapse due to his impending transfer to Okinawa. The argument goes that if he had planned for so long to kill her in that way, he would not have let the insurance on the car lapse. Otherwise, he could have collected insurance both on the car and on Melinda’s life. As it was, once the uninsured jeep was destroyed, he would be liable for the unpaid balance on the loan.
Citing United States v. Kastner, 17 M.J. 11 (C.M.A.1983), the Government argues that proof of motive is not a substantive element of any crime recognized by the common law. While it became important during the sentencing portion of the trial, we agree that the prosecution was not required to prove any *567 financial motive to convict the appellant of premeditated murder. Nonetheless, we believe it was possible that the appellant decided to kill Melinda and dispose of her body by burning it in the Suzuki, even though it was not insured, because he could recoup any balance due for the Suzuki through receipt of the life insurance proceeds. We find no merit in the appellant’s argument on this point.
5. The Forensic Evidence
The appellant next contends that the forensic evidence was of such dubious value that it could not establish guilt beyond a reasonable doubt. The forensic evidence, however, did not constitute the sole evidence in the case. It was a part of a much larger and compelling case of proof beyond a reasonable doubt. It established that a tire iron could have been the murder weapon, that the cause of death was blunt trauma injury to the skull, that human blood was found in the bedroom, and that the body in the Suzuki was that of Melinda Thomas. We do not conclude that the forensic evidence in this case was dubious. In fact, it aided in establishing the appellant’s guilt.
6. Credibility of Sgt Young and Mrs. DeLuz
In addition to attacking Nelson’s credibility, the appellant also attacks the credibility of Sgt Young and Mrs. DeLuz. Sgt Young testified with the protection of a grant of immunity. He admitted to stealing dynamite and locating a person to carry out the appellant’s murder plan. While not characteristic of an honest or law-abiding person, we do not view these collateral matters to be of sufficient magnitude to warrant disbelieving his devastating testimony of the conversations he had with the appellant.
We also find the appellant’s attack on the credibility of Mrs. DeLuz unconvincing. While there were inconsistencies in her testimony on minor collateral matters, her main points of observing the Suzuki in the carport at 0100 and the appellant’s attempt to influence her testimony are most credible.
7. Other Inconsistencies
We have examined two other alleged inconsistencies in the prosecution’s case dealing with the luggage and the location of blood in Melinda’s bedroom, and we do not find these arguments meritorious in raising reasonable doubt.
8. Appellant’s Conduct after the Murder
The appellant contends that his conduct after notification of Melinda’s death is evidence of his innocence. Various witnesses described his crying and expressions of grief over her death as genuine. On one occasion, paramedics had to be called because he began gasping and turning red. The prosecution argued this was all part of an act. Other witnesses doubted his sincerity.
There is no merit in the appellant’s argument. After the murder, the appellant told several lies. He lied about when Melinda left, about why she left, about what he was doing when she left, about her taking Christmas presents with her, about her undercover employment with NIS, and about his lack of knowledge of the location of Ortega Highway. He was doing his best to keep his story together, and we believe his emotional displays of grief and sorrow were part of his sham.
9. The Arbgast Affidavit
While this case was pending before this Court in 1992, the appellant, as part of his argument regarding ineffective assistance of counsel, submitted the affidavit of Mr. Randall Arbgast. The appellant contends that Arbgast was an alibi witness who was not called to testify by the defense team. In this assignment of error, the appellant attempts to use the contents of the affidavit to establish reasonable doubt of his guilt. For the reasons stated in Dykes, we will not consider it for this purpose. We will address this affidavit more thoroughly below regarding the appellant’s assertion that his defense counsel were ineffective.
10. The Element of Premeditation
Finally, the appellant argues that even if the evidence proved he murdered Melinda, it failed to establish the element of premeditation. He alleges that at most it was an impulsive act, devoid of prior reflection. Unpremeditated murder is not a capital offense under Article 118, UCMJ.
*568 The appellant correctly notes that premeditation requires that one “with a cool mind did, in fact, reflect before killing.” United States v. Hoskins, 36 M.J. 343, 346 (C.M.A.1993). But the evidence of premeditation was overwhelming. The appellant engaged in several conversations prior to Melinda’s death with persons who testified that he was upset with her, needed to get rid of her, and was thinking of methods to accomplish that goal. When it was suggested to the appellant that he try counselling or divorce, he said it would not suit his purpose. Other evidence that he was reflecting on murder was his surprising payment of $100 for Nelson’s rental car and the use of a tire iron, an item not normally kept in the bedroom, to commit the murder. From all indications, the murder was not the result of a sudden argument because Melinda was in bed and probably asleep when the appellant attacked her. Finally, if not the most convincing evidence, were the appellant’s comments to Nelson after the murder that it was “messier that I thought it would be” and his explanation of what they were going to do with the body, indicating that he had planned and reflected on how to dispose of evidence well before the violent acts.
We also find no merit to the appellant’s suggestion that he could not have had a “cool mind” necessary for reflection due to alcohol consumption. The testimony of witnesses who were with the appellant just before the murder indicated that the appellant was not intoxicated after leaving the DeLuz’ home.
ISSUE II
THE GOVERNMENT FAILED TO PROVE THE AGGRAVATING FACTORS BEYOND A REASONABLE DOUBT.
RCM 1004 governs capital sentencing requirements in military law. Paragraph (a) of the rule provides:
In general Death may be adjudged only when:
(1) Death is expressly authorized under Part IV of this Manual for an offense of which the accused has been found guilty or is authorized under the law of war for an offense of which the accused has been found guilty under the law of war; and
(2) The accused was convicted of such an offense by the concurrence of all the members of the court-martial present at the time the vote was taken; and
(3) The requirements of subsections (b) and (c) of this rule have been met. Paragraph (b) of the rule requires the
prosecution to give the defense written notice of which aggravating factors it intends to prove. In order for the court to adjudge a death sentence, the members must unanimously find (1) the existence of at least one of the aggravating factors beyond a reasonable doubt, and (2) that any extenuating and mitigating circumstances in the case are substantially outweighed by any aggravating circumstances. Paragraph (c) lists the aggravating factors, and subparagraph (7) of that paragraph lists the specific aggravating factors in premeditated murder cases.
In the case at bar, the Government gave notice of the factors contained in RCM 1004(c)(7)(C) and (7)(I). These factors are: “(C) The murder was committed for the purpose of receiving money or a thing of value; ... (I) The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim.” In this assignment of error, the appellant argues that the Government failed to prove either of these aggravating factors beyond a reasonable doubt. We will address each factor separately.
A Commission of Murder for the Purpose of Receiving Money or a Thing of Value.
We specifically find the Government proved this factor beyond a reasonable doubt. The appellant added a rider to his insurance policy in March 1987. This rider insured Melinda’s life for $50,000. We do not find sufficient evidence to establish that the appellant added the rider with the intent to' reap its benefits by murdering Melinda. But the evidence does establish that the appellant was certainly cognizant of the insurance money before, at the time of, and after he murdered Melinda. It also establishes that *569 the insurance money was one of the motivations for the killing.
The record is clear that the appellant became disenchanted with his marriage. He complained about it to fellow Marines. He had heard of Melinda’s possible infidelity, and he knew of her drug abuse. He thought she was unfit to care for his daughter. But the appellant made his decision to kill Melinda when he learned she had visited his command to complain of his conduct following their argument and altercation. At this juncture, she was interfering with his military career. Such complaints could provide the basis for counselling entries in his official record, lower evaluations, and possible nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815 (1994).
ROM 1004(c)(7)(C) requires the finding that the murder was committed “for the purpose” of receiving money or a thing of value. (Emphasis added.) We do not read the rule to require the finding that the murder was committed for the sole purpose of receiving money or a thing of value. Here, it was one of the reasons. This is sufficient to establish that the murder was committed for the purpose of receiving money. The following factors convince us that this was one of the appellant’s purposes:
—before the murder, the appellant knew of the existence of the policy and remarked that he would pay money from the proceeds to get rid of his wife;
—during the murder, the appellant offered $10,000 of the insurance proceeds to Nelson to help dispose of the body;
—after the murder, the appellant reminded Nelson of this sum while they were attempting to bum the Suzuki and Melinda’s body;
—on the way home after the burning, the appellant told Nelson how much better his life would be with the money and that he might even use some of it on a trip to Las Vegas; and
—while the appellant did not initiate the death claim, he signed it and repeatedly voiced disagreement with the initial suicide finding which barred his recovery, including telling a neighbor that without the finding he would have been $50,000 richer.
The insurance money was on the appellant’s mind throughout this incident. The evidence established it was one of the reasons he chose murder over divorce to end his marriage with Melinda. It was a cause of the murder, not just the result thereof. Murder committed for the purpose of collects ing the proceeds of a life insurance policy has been held to establish this aggravating factor. See Thomas M. Fleming, Annotation, Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Committed for Pecuniary Gain, as Consideration or in Expectation of Receiving Something of Monetary Value, and the Like— Post-Gregg Cases, 66 A.L.R.4th 417, 458-61 (1988); see also Harris v. Alabama, — U.S. -, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
We do not hold that the mere existence of an insurance policy and the possible receipt of proceeds alone establish that the killing was done for financial gain. This would turn virtually every murder of a husband or wife by one’s spouse into a capital case. But here, the evidence was overwhelming to establish the appellant’s desire for financial gain, or in his words, “to suit his purpose.” The appellant’s specific desire for pecuniary gain by the murder is one of the narrowing factors which restricts the class of persons eligible for the death penalty. ROM 1004(c)(7)(C). The Government proved that the appellant had this desire, in addition to showing that he wanted to terminate an unhappy marriage. This aggravating factor was unanimously found by the court-martial, and we conclude that it is legally and factually correct.

B. Commission of Murder Which Was Preceded by the Intentional Infliction of Substantial Physical Harm or Prolonged, Substantial Mental or Physical Pain and Suffering to the Victim.

The appellant first argues that this aggravating factor is unconstitutionally vague. This contention has been found without merit. Loving, 41 M.J. at 294 (citing *570 United States v. Curtis, 32 M.J. 252, 260-67 (C.M.A.1991)). But see United States v. Murphy, 30 M.J. 1040, 1058 (A.C.M.R.1990) (holding RCM 1004(c)(7)(I) does not pass constitutional muster where military judge defined “prolonged” as “more than instantaneous”), remanded on other grounds, 36 M.J. 8 (C.M.A.1992) (summary disposition), aff'd, 36 M.J. 1137 (A.C.M.R.1993), certificate for mandatory review filed, 38 M.J. 184 (C.M.A. 1993). While the Court’s opinion in Curtis did not go into great detail in explaining the full rationale for its conclusion, it simply held that RCM 1004(c)(7)(I) is “stated clearly” and did not suffer from the constitutional infirmities of state statutes that contained aggravating factors that the murder was “heinous, atrocious, or cruel.” See Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). We note, however, that in Lewis v. Jeffers, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), the Supreme Court found Arizona’s aggravating factor that the crime was committed “in an especially heinous, cruel or depraved manner” was not unconstitutionally vague where the state Supreme Court applied its narrowing construction of the aggravating factor to the facts of the case.
In light of the holdings of our superior court in Curtis and Loving, we conclude that the appellant’s argument that RCM 1004(c)(7)(I) suffers constitutional infirmities is without merit.
Whether the evidence was factually adequate to prove this aggravating factor is a separate question, and one that has evenly divided this Court. This factor requires the prosecution to prove beyond a reasonable doubt that the murder was preceded by either the intentional infliction of substantial physical harm, or by prolonged, substantial mental or physical pain and suffering to the victim. The court members must be unanimous in finding this factor. On appeal, we must be satisfied that the court-martial’s determination is legally and factually correct. Curtis, 32 M.J. at 271.
The prosecution’s evidence on this point consisted of the testimony of Nelson and a government expert. Nelson heard Melinda beg for her life. He saw her blood and her injured nose. He heard her again ask the appellant to stop hitting her. After seeing the appellant strike her in the head with the tire iron, he unsuccessfully tried to stop the appellant, and was placed in some fear for his own safety. He then watched in horror as the appellant hit Melinda in the head with the tire iron four or five more times. Except for some gurgling sounds, she said nothing more. Expert testimony related that she died of blunt force trauma to the head, and that although unconscious, she could have survived anywhere from 20 to 45 minutes from the infliction of the trauma.
We are convinced that RCM 1004(c)(7)(I) requires proof beyond a reasonable doubt of a separate intent apart from the intent to kill. This intent is one in which the perpetrator deliberately desires to precede the killing with the infliction of substantial physical harm or prolonged substantial mental or physical pain and suffering. In other words, the killer is not satisfied with the killing alone. See Commonwealth v. Henry, 524 Pa. 135, 569 A.2d 929 (1990), cert, denied, 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991); Whittington v. State, 252 Ga. 168, 313 S.E.2d 73 (1984); State v. Monroe, 397 So.2d 1258 (La. 1981), cert, denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983). Basically, in order to prove this aggravating factor, the prosecution must prove that the killer desired that his killing be preceded by substantial physical harm to the victim or prolonged, substantial mental or physical pain and suffering before dying. The mere fact of the victim’s pain, awareness of impending death or foreseeability of such suffering because of the accused’s acts is insufficient to establish this aggravating factor. The evidence that is required, whether direct or circumstantial, is that the accused intended to, and did in fact, either cause the victim substantial physical harm preceding the killing or prolonged the victim’s substantial mental or physical pain and suffering before the killing. The accused must want such harm or suffering to occur in addition to death. State v. Ramseur, 106 N.J. 123, 524 A.2d 188 (1987); Com *571 monwealth v. Nelson, 514 Pa. 262, 523 A.2d 728, cert, denied, 484 U.S. 928,108 S.Ct. 293, 98 L.Ed.2d 253 (1987).
To find otherwise would be tantamount to finding “intentional infliction of substantial physical harm” in virtually every beating-type murder. This is clearly not the intent of either the long line of Supreme Court cases since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), regarding capital punishment or of the President in promulgating RCM 1004 to narrow those types of cases which are death eligible. Simmons v. State, 419 So.2d 316 (Fla.1982) (holding that repeated blows to the victim’s head with a hatchet were insufficient to prove murder was heinous, atrocious, or cruel); Patrick v. State, 247 Ga. 168, 274 S.E.2d 570 (1981) (holding that three blows to victim’s head were insufficient to prove aggravating factor that murder was outrageously or wantonly vile, horrible, or inhuman); State v. Culberth, 390 So.2d 847 (La. 1980) (holding that repeated stabbing was insufficient to prove defendant intended to inflict pain separate from the killing). See also, Thomas M. Fleming, Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder was Heinous, Cruel, Depraved, or the Like — Post-Gregg Cases, 63 A.L.R.4th 478, 486-91, 543-50 and 594-96 (1988). But, if the cases eligible for death are properly narrowed, we believe the necessary construction approved by the Supreme Court in Lewis is performed.
The determination of whether this aggravating factor is factually correct turns on the interpretation of the appellant’s intent when the appellant struck Melinda with the initial blow to her nose. If this blow is interpreted that he meant to hit her in that specific part of her body to inflict harm apart from the murder, it can be determined that the aggravating factor was correctly found. However, if it is interpreted as but the first, albeit poorly aimed, of a barrage of blows inflicted with the intent to kill her, then it can be determined that there was no separate intent to inflict harm apart from the killing, rendering the aggravating factor not factually correct.
From all the circumstances in this case, particularly the appellant’s statements and his marital dissatisfaction, we have concluded that he intended to kill Melinda from the very first blow to her nose. The four judges in the concurring opinion believe this blow inflicted substantial harm that preceded the killing with the specific intent to cause such harm in addition to the murder. But we believe he intended to kill her as quickly and as quietly as he could, and in a manner that would result in injuries that could be attributed to a motor vehicle accident. He decided to carry out his crime while his victim was in a vulnerable position in bed. One of the pathologists testified that one blow to the head with a tire iron would likely cause immediate unconsciousness. We believe that a single blow to the head area with a tire iron is also a means likely to cause death. The fact that the first or even the second blow did not kill Melinda immediately does not necessarily prove that the appellant first intended to inflict substantial harm separately before he killed her. It also does not prove that he intended to inflict prolonged, substantial mental or physical pain and suffering prior to death, especially given the location of the crime in close living arrangements in government quarters, where neighbors were upstairs who could hear their voices and the noises of the attack. In short, the appellant’s beating of his wife, including the blow to her nose, was the actual means of accomplishing the murder, and was not part of a separate endeavor to make her suffer before she died or to inflict harm apart from the murder. The finding of this aggravating factor was not, therefore, factually correct.
What, then, is the status of the aggraváting factor where, as explained above, the Court is split by an equally divided vote on a factual question? In United States v. Ohrt, 28 M.J. 301 (C.M.A.1989), the Court held that if a Court of Military Review (now called a Court of Criminal Appeals) is evenly divided on a question of law, the general rule requiring an affirmance of the decision of the lower court applies. However, the Court specifically voiced no opinion on the result where a Court of Military Review is evenly split on a factual question or sen *572 tence appropriateness. That issue has been squarely joined in this case. Four of us agree that a tie vote on a factual question, unlike the situation dealing with a legal question, results in a reversal of the finding of the court-martial. Article 66(c), UCMJ, bestows upon us unique and broad fact-finding power to weigh evidence and to determine credibility of witnesses and controverted factual questions. It states that the Court may affirm only such findings of guilty and the sentence as we find correct in law and fact and determine should be approved. Rule 4(b) of the Courts of Criminal Appeals Rules of Practice and' Procedure, 22 M.J. CXXIX, which governs cases heard en banc, states that “[t]he determination of any matter before the Court shall be according to the opinion of a majority of the judges participad ing in the decision.” The conclusion the four of us draw from these provisions is that to affirm the findings, the sentence, or any matter involved in a case, which we all view as including an aggravating factor in a capital case, a majority of the participating judges must determine that the findings, the sentence or the matter at issue is correct in law and fact. United States v. Beckermann, 25 M.J. 870 (C.G.C.M.R.1988), aff'd on other grounds, 27 M.J. 334 (C.M.A.1989).
We must next decide whether the determination that the finding of this aggravating factor as factually incorrect results in the invalidation of the death sentence. Contrary to Senior Judge Mollison’s contention in his separate opinion, an appellate court is not precluded from upholding a death sentence where an invalid aggravating factor was before the sentencing authority as long as the appellate court either itself reweighs the aggravating and mitigating circumstances or finds the error to be harmless beyond a reasonable doubt. Sochor v. Florida, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992); Clemons v. Mississippi 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Loving, 41 M.J. at 268; United States v. Curtis, 38 M.J. 530, 533 (N.M.C.M.R.), mandatory review filed, 39 M.J. 60 (C.M.A.1993); Murphy, 30 M.J. at 1058-59.
Rule for Courts-Martial 1004(b)(4)(A) states that death may not be adjudged unless “[t]he members find that at least one of the aggravating factors under subsection (c) existed.” Once one or more aggravating factors are found unanimously to exist beyond a reasonable doubt, RCM 1004(b)(4)(C) requires that “[a]ll members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under RCM 1001(b)(4), including the factors under subsection (c) of this rule.” We have found that only one of the two aggravating factors found by the members was factually established. The question now is whether this requires a remand for a new sentencing hearing because the invalid aggravating factor may have influenced the members to “tip the scale” in the weighing process toward death. Curtis, 38 M.J. at 534.
We conclude that a new sentencing hearing is not required. The aggravating factors in military capital sentencing serve first as “gates” through which the case must pass to proceed to the next level. Once one or more gates are passed, the members proceed to the next step, i.e., the weighing of the aggravating and mitigating circumstances. This step includes consideration of any aggravating factor(s) previously found. In the final analysis, the members of a court-martial do not simply count the number of aggravating factors against a specific number of mitigate ing factors, and decide on a death sentence if there are more of the former than the latter. After finding one or more aggravating factors, military members must weigh all of the circumstances in the case, including the aggravating factors, and all of the other facts in the case.
In this case, even though we have found that the RCM 1004(c)(7)(I) finding was not factually correct because of a lack of evidence as to the appellant’s separate intent to precede the murder by inflicting substantial physical harm or prolonging Melinda’s pain and suffering, we ourselves may reweigh the circumstances and the remaining factor of pecuniary gain without the appellant’s separate intent to precede the killing with the infliction of substantial harm. We believe *573 this separate intent was a de minimis matter in the case as a whole and was subsumed within all of the other circumstances including the appellant’s intent to murder and his selection of a brutal method to kill his wife. Even without the second factor, we are still left with all of the following in the weighing process: the financial reason for the killing, the manner of killing, the pain and suffering Melinda felt, her fear of death, the fact that the killing took place in the face of Melinda’s pleas for her life, the relationship of the parties as husband and wife, Melinda’s pregnancy, the attempted staging of an accident to dispose of the body, and all of the other facts surrounding the crime as aggravating circumstances in the weighing process. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1994).
In other words, the essential facts that supported the invalid aggravating factor such as the brutal manner of the killing, Melinda’s broken nose, her obvious fear of death, and her momentary pleas for mercy are not excluded from consideration in the weighing process even though we have found factual insufficiency to prove the aggravating factor as to the appellant’s intent. We may consider such facts, aside from the intent, as aggravating circumstances in the weighing process instead of as an aggravating factor, as long as one aggravating factor (in this case, the murder for the purpose of receiving money) remains.
Here, the first aggravating factor, that the appellant murdered his wife to receive money, standing alone, is sufficient to pass through the required gate before arriving at the weighing process. We have carefully reweighed the aggravating, extenuating and mitigating circumstances. We have given significant weight to the appellant’s clean record, his family background, and the testimony of numerous witnesses who spoke of his capacity to become a productive member of society. We have concluded, however, that the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances. It is clear to us that although only one of the two aggravating factors remains, all of the circumstances are exactly the same, except for the appellant’s intent to precede the murder with the infliction of substantial physical harm or to prolong the pain and suffering. The fact that they are considered as “circumstances” and not a “gate” or aggravating factor does not affect our conclusion. They are nonetheless matters properly contained in the weighing process. Thus, even with one aggravating factor instead of two, we do not believe this alone would have altered the members’ determination to adjudge death given all of the circumstances of this case. See Stringer v. Black, 503 U.S. 222, 230-31, 112 S.Ct. 1130, 1136-37, 117 L.Ed.2d 367 (1992).
In conclusion, we are convinced that the invalid factor or any consideration of the appellant’s intent to precede the killing by inflicting substantial harm or to prolong the pain and suffering did not tip the scales against the appellant. We find that any error in finding the second aggravating factor was harmless beyond a reasonable doubt and did not affect the imposition of the sentence.
ISSUE III
APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.
The appellant was defended by both a detailed defense counsel, Major Renner, and an individual military counsel, Major Stevens, who is now a retired lieutenant colonel, and for the sake of simplicity will be referred to in this opinion by the rank he held at the time of trial. The appellant asserts that these counsel made numerous errors in the course of his defense. He requests that we order a hearing pursuant to United States v. DuBay, 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967), to gather additional evidence on various aspects of his ineffective assistance of counsel accusations. We have determined that such a hearing is not necessary in this case, and that the appellant was not denied effective assistance of counsel in his defense. Accordingly, the appellant’s motion for a DuBay hearing is denied.
In response to the appellant’s assertions of ineffective assistance of counsel, appellate government counsel obtained and filed with the Court affidavits of both Major Stevens and Major Renner. We granted the Govern *574 mentis motions to file the affidavits. On 7 April 1995, the Court of Appeals for the Armed Forces issued its opinion in United States v. Lewis, 42 M.J. 1 (1995). Lewis initiated a new procedure for addressing ineffective assistance of counsel claims. Citing its misgivings about appellate government counsel requesting affidavits from trial defense counsel, the Court stated that trial defense counsel should not be compelled to justify their actions until a court of competent jurisdiction reviews the allegation of ineffectiveness, the Government’s brief, and the record to first determine if the presumption of competence has been rebutted. If the court reviewing the case determines that counsel must justify their actions, then it may direct that further information be provided for the court’s review.
We have found no harm in the Government’s procurement of the affidavits in this case. In light of the nature of the appellant’s assertions, we would have requested them anyway, and the same information would have ultimately been before us for review. Also, the contents of the affidavits reveal nothing which is not reasonably related to the appellant’s allegations. The concerns expressed by the Court in Lewis do not therefore appear to be problematic in this appeal. The following information was derived from the affidavits filed by the Government.
At the time of her assignment as the appellant’s detailed defense counsel, Major Renner was the senior defense counsel at El Toro. She had extensive trial experience from her assignments at Camp Pendleton, Okinawa and El Toro, including over 600 cases, with 90 members trials. She had been assigned to only one previous capital case in Okinawa. Prior to that case, she consulted with more experienced counsel and expert witnesses, read several articles on death penalty issues, and obtained copies of pleadings used in other military and civilian capital cases. She states in an affidavit that in preparation for the appellant’s case, she read approximately ten law review articles on the death penalty as well as other legal publications. She again consulted with more senior counsel, including the appellate defense division, civilian counsel, and experts in the fields of blood splatter analysis, DNA analysis, blood typing, forensic radiology, forensic odontology, accident reconstruction, and psychology. She states that her preparation included interviewing all potential witnesses, and conducting simulated question and answer sessions in the courtroom. She asserts that the trial team, which included Major Stevens, Mr. Rowell (an investigator), Mr. Hall (a civilian attorney who appeared on behalf of the appellant at the Article 32 investigation) and herself,' interviewed every potential witness and tracked down every possible lead.
The defense theory on sentencing centered on the human side of the appellant, pointing out his rehabilitative potential and the lack of any retributive purpose to be served by the death penalty. The defense sentencing case consisted of the unsworn statement of the appellant, the testimony of 13 witnesses, voluminous documentary evidence consisting of service record entries, evaluations, certificates and awards, 50 pages of family photographs from the time of the appellant’s infancy through his childhood to young adulthood, a record of academic courses taken at a local university where he received grades of A, 19 pages of his diary, and two letters, one from a Marine Corps captain, attesting to the appellant’s rehabilitative potential and excellent record.
Following trial, Major Renner submitted a detailed reply to the staff judge advocate’s recommendation and a clemency petition with numerous enclosures supporting her plea to spare the appellant’s life.
Initially, Major Stevens submitted three affidavits. His 1991 affidavit describes how he and Major Renner divided responsibilities in preparing for the trial. Their theory of defense was to convince the court that Nelson had murdered Melinda Thomas. Nelson was aware of all the minute details of the incident, yet he denied culpability. Stevens believed the prosecution’s case would fail if Nelson refused to testify, and even if he did testify, that at least one member would not believe him. Major Stevens recalled that he, Major Renner and the appellant discussed at length whether or not the appellant should testify on the merits. Stevens strongly ad *575 vised him not to do so. He states that the appellant took his advice and made his own decision not to take the witness stand. He also acknowledged that Major Renner conducted the presentation of the sentencing case.
In his 1992 affidavit, Major Stevens stated that “based on standards set for the preparation of sentencing in capital litigation I was totally ineffective.” He reasoned in support of this statement that no life history investigation was conducted, only one mental health expert was consulted, and that the only psychiatric examination that was done revealed that the appellant had significant problems. He said that because this was his first capital case, he lacked the training to realize what to do with this information. He added that he approached this sentencing hearing “like any other court-martial.” He believed he failed his client by not assembling a complete social, educational, economic, medical and mental health history from the time of the appellant’s birth until his trial. He kept “negative” information about his client under wraps because he feared that they might lead to a death sentence. He said he did not realize how such information could have been used as mitigation if handled correctly. Major Stevens said that he did not attend a capital litigation seminar, did not talk to experts in the field of capital litigation, and very little was available to him in the area of capital litigation.
In his 1994 affidavit, he states that he did not recall school matters being obtained or any extensive check into childhood matters. He did not view voluntary intoxication as a viable defense. He concluded that he did not request a second psychiatric examination because the first one was so bad that he did not want to risk the chance of damaging information leaking out.
After the appellant filed his brief in July 1994, both Major Renner and Major Stevens provided additional affidavits addressing specific alleged deficiencies raised by the appellant. Facts from those and other affidavits are incorporated in the discussion of the specific alleged deficiencies of counsel noted below.
Any discussion of the law governing the disposition of ineffective assistance of counsel claims must center on the Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which is applicable to military trials. United States v. Scott, 24 M.J. 186 (C.M.A. 1987). Its holding also applies to military capital cases. Loving, 41 M.J. at 241-42. In Strickland, the Court set forth a two-pronged test which an accused must meet to establish ineffective assistance of counsel. The two prongs are incompetence and prejudice. The former requires a showing that counsel “made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” 466 U.S. at 687, 104 S.Ct. at 2064. In determining whether counsel’s performance was so deficient, we must find that it fell below an objective standard of reasonableness. United States v. Lawson, 40 M.J. 475, 476 (C.M.A.1994) (citing Strickland, 466 U.S. at 688, 104 S.Ct. at 2064-65). Counsel’s own opinion, or that of any other attorney who has reviewed the counsel’s performance, is therefore not determinative. The latter prong requires a showing that the errors were so serious so as to deprive the defendant of a fair trial, which the Court defined as “a trial whose result is reliable.” Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. In this analysis, defense counsel is presumed to be competent. Judicial scrutiny must be highly deferential to counsel’s performance. This performance will not be examined with hindsight, but by counsel’s perspective at the time of the alleged error and in light of all the circumstances. United States v. Tharpe, 38 M.J. 8 (C.M.A.1993); United States v. Bono, 26 M.J. 240 (C.M.A.1988); Curtis, 38 M. J. at 538. Review of ineffective assistance of counsel issues will turn on the answers to the following questions:
1. Are the appellant’s allegations true; and, if they are, is there a reasonable explanation for counsel’s actions?
2. If they are true, did counsel’s level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers?
•3. If counsel’s performance fell below that level, is there a reasonable probability that, *576 absent the errors, the factfinder would have had a reasonable doubt of the appellant’s guilt?
United States v. Polk, 32 M.J. 150, 153 (C.M.A1991).
Appellate defense counsel have briefed this issue to us in a 161-page assignment of error, specifying ten areas of ineffectiveness with numerous sub-areas below them. We have reviewed all of their arguments and find no merit in them. We will, however, discuss some of these arguments in greater detail.

A Defense counsels’ failure to call Randall Arbgast as an alibi witness.

In his affidavit, the appellant states that he informed his attorneys well before trial that there was a witness, a security guard at Nelson’s apartment complex, who could provide an alibi for him on the night of the murder. The appellant did not relate the name of the witness. Both Major Stevens and Major Renner state in their affidavits that they tasked Mr. George Rowell, a private investigator hired by the appellant, to locate this witness. The guard turned out to be a Mr. Randall Arbgast. Major Renner recalls the following:
Mr. Rowell did interview Mr. Arbgast on one occasion. I believe that Mr. Rowell went to Nelson’s apartment complex to find out the name of the security guard on duty for the night in question. I am not certain if that is how we determined the identity of the security guard. Mr. Rowell did interview Mr. Arbgast at his apartment. As I remember, Mr. Rowell reported that Arbgast did know Nelson, and the car he drove. Arbgast also told Rowell that he did remember seeing Nelson, Thomas and Thomas’ daughter together several times in the complex, but could not recall any specific dates. Arbgast did not provide Rowell with any details of Nelson’s and/or Thomas’s movements on the night in question. Based upon my dealings with Rowell in the case up to that point, I had no reason to doubt Rowell’s interview techniques or to question his report. Based upon Rowell’s interview of Arbgast, Arbgast did not have a specific recollection of anything that occurred on the night in question, therefore the defense did not call him as a witness.
Major Stevens states:
Sgt. Thomas did tell us about the security guard. Our private investigator, Mr. George Rowell, contacted this witness. We were informed that the security guard had nothing to say. He did not remember seeing Sgt. Thomas that night and did not have anything useful to say. Sgt. Thomas had told us that the security guard would testify that he saw Nelson drop Thomas off the night that Mrs. Thomas was killed. This did not turn out to be the case.
The appellant told his counsel about the guard in May 1988, about 6 months after the time of Melinda’s death.
In April 1992, over 3 years after trial, and over 4 years after the night of the murder, Mr. Arbgast signed an affidavit which has been submitted to us for consideration. He states that Mrs. Linda Thomas, the appellant’s current wife, and another individual interviewed him in July 1988. He recalls that he was on duty at Nelson’s apartment complex the night of 9-10 December 1987 and:
I came on duty, as usual, at about 6:00 p.m. on December 9, 1987. My watch would end at 6:00 a.m. the next morning. I worked this shift for about one year at this complex before December 1987. I would tour the complex at about 11:00 p.m., have illegally parked cars towed, and then eat my lunch. Sometime between 12:00 a.m. and 12:30 a.m., Mr. Nelson drove into the complex in a dark two-door Buick....
....Sergeant Thomas was also in the car, holding a girl who looked like she was between 2 and 5 years old....
All three then went into the apartment complex to Mr. Nelson’s apartment.... Mr. Nelson drove out of the complex alone....
I was told when I was interviewed in 1988 that I would be called to testify in Sergeant Thomas’ trial, but heard nothing about the case and was not contacted again until June 1991 when I was contacted by a *577 private investigator who said he was representing Sergeant Thomas.
In December 1994, Mr. Arbgast signed a second affidavit. After being informed that Mr. Rowell alleged to have interviewed him prior to trial, Arbgast emphasized that he had “never spoken to or corresponded with a private investigator by the name of George Rowell.” He added that “[i]f he says that he interviewed me in connection with this case he is lying.” He identified the investigator he spoke with in 1991 as a Mr. Burdick. Additionally, when discussing his recollection of the night in question, Arbgast said, “Although I do not know how I recalled my location at that time I suppose during the interview by Mrs. Thomas and her companion it was possible that they suggested this date to me — I don’t really know.” He certified that if he said in 1992 that he was on duty on the night in question, he was certain he was there. When contacted by government authorities, Mr. Rowell refused to answer any specific questions regarding his investigation of Mr. Arbgast without a waiver from the original defense team and the appellant. No such waiver has been tendered.
Scott holds that effective assistance of counsel includes the duty to make reasonable investigations, and that a decision not to investigate must be directly tested for reasonableness considering all of the circumstances, and with great deference to counsel’s judgments. 24 M.J. at 188 (citing Wade v. Armontrout, 798 F.2d 304 (8th Cir.1986)).
The appellant has argued that (1) a direct conflict exists between the affidavits and (2) a DuBay hearing is the only way to resolve the issue of whether Rowell actually interviewed Arbgast. We believe that he did interview him based on the details provided in Major Renner’s affidavit. Also, based on all of the other evidence in the case, we conclude that Arbgast did see Nelson and the appellant enter the complex on the night in question, but he is mistaken as to the hour he saw them. The testimony at trial indicated that at 0030 the appellant was at DeLuz’s house and at 0100 he was talking in his carport. He actually entered Nelson’s apartment complex much later after disposing of Melinda’s body. We believe Arbgast’s memory as to the precise time he saw Nelson and the appellant enter the complex was affected by the passage of time and the coaching he received. It would not be surprising that he could not recall the details of the night in question 6 months later. It is difficult to believe he could recall them with greater detail 4 years after the event.
But even if Rowell had not interviewed Arbgast, we would still find that the appellant has not satisfied the first prong of Strickland. Had the defense team known that he would state that he saw Nelson and the appellant at Nelson’s apartment complex between 0000-0030 on the night in question, counsel’s decision not to present this testimony in the defense case-in-chief would have been a reasonable decision. After all, the members would have just heard numerous witnesses testify as to the appellant’s statements about Melinda’s whereabouts and that she left home at 2200. Arbgast’s testimony that the appellant then vacated his home with his daughter would make no sense at all if the appellant’s versions were true. Additionally, in another way, Arbgast’s testimony would have buttressed Nelson’s testimony in that the appellant would have had a good reason not to spend the night at home after his wife had been brutally murdered there.
In 1989, a few months after trial, the appellant signed an affidavit indicating what he says really happened, namely that an argument broke out in his home, and Nelson hit Melinda with a fishing gaff, knocking her unconscious. Both of his counsel denied ever having heard this version prior to trial. The appellant states that he took his daughter to Nelson’s residence at that time. This would have been in general agreement in time with Arbgast’s recollection. But this scenario also makes little sense, for if Nelson had really assaulted Melinda, and if the appellant loved her so much, the appellant would have come to her defense or at least have called the police or an ambulance. Instead, his story that he simply left her there unconscious, and that Nelson supposedly returned to kill her and dispose of her body, is patently incredible. In conclusion, the Arbgast version is inconsistent with either theory, and actually supports Nelson’s testimony, except for the hour of their entry into the apartment complex.
*578 In light of these considerations, we conclude that the appellant has not met his burden of showing serious deficiency by counsel. Whether Rowell denied the interview took place or verified it would not really matter. Therefore, a DuBay hearing is not necessary.
Lastly, even if the defense had met the first prong of Strickland, it would not meet the second. Had Arbgast actually testified before the members in accordance with his affidavit, it would have backfired. The members would have readily seen the inconsistency of his testimony with the appellant’s statements to others, and also its possible consistency with Nelson’s testimony. In short, it may have added to the Government’s case rather than detracted from it. We find that the case against the appellant would have easily withstood the introduction of Arbgast’s testimony, and we therefore conclude that the appellant has not demonstrated prejudice.

B. Defense counsels’ failure to request a psychosocial investigation and obtain the appellant’s school records.

Prior to trial, the defense obtained a psychiatric evaluation of the appellant. It did not obtain a comprehensive psychosocial investigation prepared by a mitigation specialist in capital cases. The appellant argues that his counsel were ineffective for not requesting or obtaining such an investigation in a Capital case. However, counsel conducted a reasonable investigation into the possibility of psychiatric evidence to be used on the appellant’s behalf. They were told that the appellant had both an antisocial personality disorder (socio-psychopathic with paranoid features) and an obsessive compulsive personality disorder (with depressive features), and that he suffered from cocaine and alcohol dependence. Counsel chose not to pursue this area further, and we do not find this decision unreasonable or to be a serious deficiency. It was reasonable for counsel to want to keep such information from the members, which they did. Also, the use of psychosocial investigations and mitigation experts is not required, even in capital cases. Loving, 41 M.J. at 250.
We reach the same conclusion regarding the appellant’s school records. Counsel presented a reasonable sentencing case for the appellant’s life. Numerous family members testified that he could be rehabilitated. Photographs, university grades, and letters were submitted to the court. We do not agree that the failure to obtain the appellant’s school records from his childhood amounted to a serious deficiency by counsel or that they would have made a difference in the sentencing determination, particularly in light of the fact that they would have disclosed he was an average student. Therefore, we find no merit in this argument.

C. Failure to investigate and use evidence of the appellant’s intoxication.

During the investigation into Melinda’s death, the appellant told an investigator from NIS that he could not recall much from the night in question due to his intoxication from having consumed 18 beers and “two shots.” However, witnesses who were with him during the night of 9-10 December 1987 testified that the appellant was not intoxicated and drank no more than one or two beers. On appeal, the appellant now alleges that his defense counsel were ineffective for not investigating and pursuing the voluntary intoxication defense.
By the calculations in his own brief, the appellant asserts that the consumption of the amount of alcohol he told the NIS investigator he had consumed would have resulted in a blood alcohol content of .54. At a later point, the brief reflects that a reading that high would cause death. We think this illustrates the clear falsity of the appellant’s claim and the reasonableness of his counsel’s decision not to use this avenue at trial. Counsel had sound reasons not to pursue this defense, and we will not second-guess them now. Loving, 41 M.J. at 242; United States v. Morgan, 37 M.J. 407 (C.M.A.1993).

D. The remaining bases for asserting ineffective assistance of counsel

We have examined all of the remaining bases asserted by the appellant for ineffective assistance of counsel, and we have determined that none has merit. The defense counsel, although without extensive capital litigation experience, provided the appellant with the reasonably competent representation to which he was entitled under the *579 law. The Supreme Court has held that limited experience does not raise a presumption of ineffectiveness. United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); see also Loving, 41 M.J. at 300. The quality of legal representation the appellant had a right to is that defined in Strickland. We have determined that this standard was met throughout this case. In reaching this conclusion, we have utilized an objective standard of reasonableness to measure counsel’s performance. Lawson 40 M.J. at 476. Neither Major Stevens’ confession of ineffectiveness on sentencing nor the opinions of persons experienced in capital litigation are determinative. In fact, after reviewing this record, we are impressed at how well this case was tried on both sides. We think the comments of Judge Cox in United States v. Sanders, 37 M.J. 116 (C.M.A.1993), are relevant in this case:
Before this Court, appellate defense counsel have filed a veritable catalogue of alleged insufficiencies regarding the investigation, preparation, and performance of the trial defense team____ The great bulk of this attack involves second-guessing tactical decisions, which we dismiss as mere Monday-morning quarterbacking. After a losing effort, hindsight usually suggests other ways that might have worked better; but that is not the measure of ineffective assistance of counsel. One cannot read this record without appreciating the sustained, determined, professional effort made throughout by the trial defense team. Suffice it to say, if this trial defense effort constitutes ineffective assistance, few courbmartial convictions can ever be sustained.
37 M.J. at 118-19, cert, denied, — U.S. -, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993).
ISSUE IV
THE DELIBERATIVE PROCESS IN THE FINDINGS PORTION OF APPELLANT’S TRIAL WAS PROCEDURALLY FLAWED, AND THE MILITARY JUDGE ERRED IN REFUSING TO POLL THE MEMBERS TO DETERMINE IF THEY HAD VOTED MORE THAN ONCE ON FINDINGS.
As stated above, we have decided that the panel decision in United States v. Thomas, 39 M.J. 626 (N.M.C.M.R.1993), was correct. We adopt its rationale for the purpose of this opinion. See also Loving 41 M.J. at 232-39. Therefore, we find no merit in this assignment of error.
ISSUE V
THE MILITARY JUDGE ERRED IN INSTRUCTING THE MEMBERS THAT A MAJORITY OF THEM COULD VOTE FOR RECONSIDERATION WITH AN EYE TOWARDS INCREASING THE PUNISHMENT OR TOWARDS RECONSIDERING AN AGGRAVATOR WHICH WAS ORIGINALLY NOT FOUND UNANIMOUSLY, AND THE MILITARY JUDGE ERRED BY NOT POLLING THE MEMBERS TO ENSURE THAT THEY HAD FOUND THE AGGRAVATING CIRCUMSTANCES UNANIMOUSLY.
During the sentencing hearing, the military judge instructed the members that if their vote on an aggravating factor was not unanimous and there was a request to reconsider, then a majority would be required to reconsider a vote that was not unanimous. Defense counsel did not object. Citing RCM 922, the appellant argues by analogy that this instruction was erroneous for the same reason that members are not allowed to reconsider a nonunanimous vote on findings in order to authorize a capital sentencing proceeding. Initially we find the military judge’s instructions regarding reconsideration of the sentence to be in accordance with RCM 1009(d)(3)(A). We note that RCM 1009, the rule governing reconsideration of sentences, does not specifically answer the question regarding voting procedures for reconsideration of an aggravating factor. We conclude that the military judge’s instruction was neither plain error , nor an abuse of discretion. Finally, the military judge did poll the members regarding their findings on the aggravating factors.
*580 ISSUE VI
THE MILITARY JUDGE’S INSTRUCTIONS ON SENTENCING TO THE MEMBERS WERE CONFUSING AND MISLEADING IN THAT THE INSTRUCTIONS WERE CONTRADICTORY WITH REGARD TO THE VOTING PROCEDURE ON SENTENCE BECAUSE IN ONE SECTION OF THE INSTRUCTIONS THE MILITARY JUDGE SUGGESTED THAT THE COURT MEMBERS MUST VOTE ON DEATH FIRST AND IN ANOTHER SECTION THE MILITARY JUDGE SUGGESTED THAT THE COURT MEMBERS VOTE ON PROPOSED SENTENCES BEGINNING WITH THE LEAST SEVERE FIRST.
During the sentencing hearing, the military judge instructed the members as follows:
Again, as I stated before, should there be a unanimous vote on one or both of the aggravating factors, then you turn to all of the sentences on Page Two, death or life, the most serious, of course, is death. Any proposed sentence you vote on — after you’ve collected any proposed sentence when you reach that stage, the junior member will collect the proposed sentences, submit them to the president, he’ll arrange them in their order of their severity. You vote on the proposed sentence by secret written ballot, all must vote. You vote on each sentence in its entirety beginning with the lightest until you arrive at your required concurrence of two-thirds of the members, with the exception, of course, as I’ve stated, in this regard, you vote on the aggravating circumstances, then you vote on the sentence of death. If it is not by unanimous vote, then you turn to the consideration of the other applicable portions of the sentence worksheet.
Record at 1525. The defense did not object to this instruction.
The appellant notes correctly the errors and inconsistencies in the cited instruction. At one point, following a unanimous finding on one or more of the aggravating factors, the military judge told the members to vote on the lightest proposed sentence first. Then he told them, after a finding of one or more of the aggravating factors, to vote on the death sentence first, and if the vote was not unanimous for that punishment, to then consider other punishments. He also erred by instructing that a two-thirds concurrence was sufficient for other punishments. A vote for life imprisonment, the lightest period of confinement authorized under Article 118(1), UCMJ, actually required a three-fourths concurrence. ROM 1006(d)(4)(B).
Addressing the latter error first, we find that instructing the members that only two-thirds of them needed to concur on a life sentence instead of the required three-fourths could only have benefited the appellant. By requiring six of the nine members instead of seven to agree on confinement for life gave the appellant more of an opportunity to avoid the death sentence. We therefore find this error harmless to him. United States v. Gonzalez, 39 M.J. 459 (C.M.A.), cert. denied, — U.S. -, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994).
Turning to the former error, regarding which sentence should be voted on first following a finding of one or more aggravating factors, the military judge gave a contradictory instruction. At one point he told them to vote on the lightest sentence first, and at another point to vote on death first. The correct instruction was to vote on the lightest proposed sentence first. Therefore, we find error. However, without an objection at trial, we must determine if the failure of the military judge to clearly instruct on voting on the lightest sentence first amounts to plain error. In United States v. Fisher, 21 M.J. 327 (C.M.A.1986), the Court rejected the per se approach to plain error in reviewing this issue. It expressed concern in an approach that would grant relief to an accused when he remained silent at trial, made no objection, and then raised instructional error for the first time on appeal. The Court’s clear desire was to require trial participants to seek.a fair and accurate trial the “ ‘first time around.’ ” Fisher, 21 M.J. at 328 (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).
*581 We have analyzed this error under the plain error guidelines provided in Fisher, and we have concluded that plain error did not occur. When viewing the sentencing instructions as a whole, and examining the entire record, we are satisfied that the error did not “seriously affect the fairness, integrity or public reputation of judicial proceedings.” Fisher, 21 M.J. at 328 (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).
ISSUE VII
THE MILITARY JUDGE’S INSTRUCTIONS AND SENTENCE WORKSHEET LED THE MEMBERS TO BELIEVE THAT THEY HAD TO FIND MITIGATING FACTORS UNANIMOUSLY BEFORE MITIGATING FACTORS COULD BE USED IN THE ‘WEIGHING PROCESS.”
We find no merit in this assignment of error. The military judge instructed the members properly that they had to find the aggravating factor or factors unanimously, and that once they entered the weighing process, they were to consider all evidence in mitigation and extenuation and balance that evidence with the aggravating circumstances. The military judge also itemized the extensive mitigating evidence the members were to consider. The members were never instructed that they were required to make specific findings regarding mitigating factors. The instructions and the worksheet would not lead any reasonable member to conclude what the appellant alleges.
ISSUE VIII
THE MILITARY JUDGE ERRED IN INSTRUCTING ON FINDINGS AND SENTENCING THAT REASONABLE DOUBT MEANT PROOF TO MORAL CERTAINTY RATHER THAN EVIDEN-TIARY CERTAINTY AS REQUIRED BY CAGE v. LOUISIANA, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
This issue has been decided adversely to the appellant. Loving, 41 M.J. at 281; United States v. Meeks, 41 M.J. 150 (C.M.A.1994); United States v. Robinson, 38 M.J. 30 (C.M.A.1993).
ISSUE IX
THE MILITARY JUDGE ERRED IN FAILING TO PROPERLY LIMIT THE TESTIMONY OF CAPTAIN WAGNER ON THE USE OF HYPOTHETICALS OR, IN THE ALTERNATIVE, HE ERRED IN FAILING TO PROVIDE THE MEMBERS WITH ADEQUATE INSTRUCTION PERTAINING TO THE USE OF HYPOTHETI-CALS IN EXPERT TESTIMONY.
Captain Wagner was one of the pathologists who testified for the prosecution at trial. He related various opinions during his testimony, including those relating to the impact damage to the Suzuki and the fractures noted in Melinda Thomas’ x-rays. To illustrate his points in these two areas, he utilized a soda can and a hard-boiled egg in front of the members as demonstrative evidence. His opinion was that Melinda’s skull injuries were caused by blunt force trauma rather than crash injuries based on the interior space in the vehicle and other factors. The appellant now faults the. military judge for allowing Captain Wagner to*'use these items in his testimony and for not giving the members a limiting instruction regarding their use. There was no objection at trial to Captain Wagner’s use of the items and no request for a limiting instruction.
The decision to allow or deny the use of demonstrative evidence is generally left to the sound discretion of the trial judge. United States v. Stark, 24 M.J. 381, 385 n. 2 (C.M.A.1987), cert, denied, 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988). We perceive no abuse of discretion in this case. Moreover, even if we had found otherwise, the error was waived. Mil.R.Evid. 103.
ISSUE X
THE MILITARY JUDGE ERRED IN FAILING TO INSTRUCT THE MEMBERS THAT ANY RESIDUAL DOUBT THEY ENTERTAINED REGARDING APPELLANT’S GUILT SHOULD BE CONSIDERED A MITIGATING FACTOR WHEN WEIGHING THE DEATH PENALTY.
In Franklin v. Lynaugh, 487 U.S. 164, 172-73, 108 S.Ct. 2320, 2326-27, 101 *582 L.Ed.2d 155 (1988), the Supreme Court held there is no constitutional right in a capital case to an instruction that any lingering doubt regarding guilt should be considered as a mitigating factor in sentencing. Furthermore, in this case, the defense did not request such an instruction, and, absent plain error, waived the issue. RCM 1005(f). We find no plain error under the circumstances of this case, and, therefore resolve this issue against the appellant.
ISSUE XI
THE MILITARY JUDGE’S INSTRUCTIONS RESTRICTED FREE CONSIDERATION OF THE EVIDENCE BY REQUIRING THE MEMBERS TO VOTE ON THE MOST SERIOUS OFFENSE FIRST.
RCM 921(c)(5) requires court-martial members not to vote on lesser included offenses unless a not guilty finding has been reached on the greater charged offense. Voting must proceed from the most severe offense to the least severe until a finding of guilt has been reached. The military judge’s instructions complied with this rule. We find no basis in this case for the appellant’s fear that the members seized on the premeditated murder offense without a full and fair discussion of all the evidence. Accordingly, there is no merit in this assignment of error.
ISSUE XII
A MANSLAUGHTER INSTRUCTION MUST INCORPORATE THE SUBJECTIVE BELIEF RATHER THAN THE OBJECTIVE BELIEF OF A REASONABLE PERSON.
The military judge instructed the members on the lesser included offense of voluntary manslaughter. The defense did not object to it. We have reviewed this instruction, which was taken directly from the standard Benchbook instruction on voluntary manslaughter. Department of the Army Pamphlet 27-9 of 15 October 1986, ¶ 3-87. The portion of the instructions quoted by the appellant in his brief is taken from the military judge’s instruction on unpremeditated murder. We have resolved this issue against the appellant because the military judge’s instructions on the lesser included offenses were correct as a matter of law. And, in the absence of plain error, failure to object to an instruction before the members close to deliberate on findings constitutes a waiver of the objection. RCM 920(f).
Within this assignment of error, the appellant also argues that the instructions on the lesser included offenses did not take into consideration the intoxication of the appellant. Besides not being reasonably raised by the evidence at trial, United States v. Watford, 32 M.J. 176 (C.M.A.1991), we find no error in this regard because voluntary intoxication cannot defeat the capacity of an accused to entertain the intent to kill or inflict great bodily harm involved in unpremeditated murder. Morgan, 37 M.J. at 412. The intent elements of unpremeditated murder and voluntary manslaughter are identical. Compare MCM, Part IV, ¶ 43b(2)(d) with MCM, Part IV, ¶ 44b(1)(d). This argument is also meritless.
ISSUE XIII
THE MILITARY JUDGE’S INSTRUCTION ON PREMEDITATED MURDER AS “MURDER COMMITTED AFTER FORMATION OF A SPECIFIC INTENT TO KILL SOMEONE AND CONSIDERATION OF THE ACTION INTENDED” DID NOT SUFFICIENTLY ADVISE THE MEMBERS OF THE MALICE ASPECT OF PREMEDITATION AND DID NOT PERMIT AN INFORMED MEMBER TO EVALUATE THE APPELLANT’S MENS REA AT THE TIME OF THE OFFENSES.
The appellant next argues that the instruction the military judge gave which distinguished premeditated murder from unpremeditated murder deprived the members of the opportunity to truly understand the difference between the two offenses. In military law, premeditated murder requires a specific intent to kill someone and consideration of the act intended. Unpremeditated murder only requires an intent to kill or inflict great bodily harm. In the latter of *583 fense, there is no requirement for consideration of the act intended. In Loving, the Court stated that “the words ‘consideration of the act intended to bring about death’ have ordinary meanings and are readily understandable by court members.” Loving 41 M.J. at 280 (quoting United States v. Teeter, 16 M.J. 68, 72 (C.M.A.1983)). The Court there rejected a similar argument, and we also find no merit in it.
ISSUE XIV
THE MILITARY JUDGE ERRED IN FAILING TO GIVE AN INSTRUCTION ON SELF-DEFENSE REGARDING APPELLANT’S ALLEGED MURDER OF HIS WIFE SINCE THERE WAS EVIDENCE WHICH, IF BELIEVED BY THE COURT MEMBERS, INDICATED THAT SHE HAD RECENTLY ATTACKED HIM.
Citing testimony that Melinda had attacked the appellant in a fight over his haircut the night before her death, the appellant argues that the military judge was required to give a self-defense instruction to the court members. We disagree.
Self-defense is an affirmative defense to homicide where an accused reasonably apprehends that death or grievous bodily harm was about to be inflicted upon him, and the use of force he used was necessary for protection from such death or grievous bodily harm. RCM 916(e)(1). When the evidence reasonably raises such a defense, the military judge is obligated to instruct the members on that defense. In this case, however, the evidence did not reasonably raise the issue of self-defense. While there was some evidence that Melinda was involved in an altercation with the appellant the day before her death, the record is devoid of any indication that the appellant was under any reasonable apprehension of his own death or grievous bodily harm, not to mention the lack of any evidence whatsoever that the extreme level of force he employed was necessary to defend himself. We find this issue totally without merit. United States v. Reid, 32 M.J. 146 (C.M.A.1991).
ISSUE XV
THE MILITARY JUDGE FAILED PROPERLY TO INSTRUCT THE MEMBERS REGARDING THE LAW OF A CAPITAL CASE AND THE CAPITAL SENTENCING MECHANISM OF R.C.M. 1004 AND 1006, WHEN THE JUDGE FAILED TO INFORM THE MEMBERS OF THESE MATTERS IN PRELIMINARY INSTRUCTIONS AND FIRST EXPLAINED THEM AFTER COUNSEL’S SENTENCING ARGUMENT.
In this issue, the appellant asks us to adopt a rule that would require the military judge in a capital case, without a defense request, to instruct the members concerning capital sentencing procedures during preliminary instructions. We decline to adopt such a rule.
RCM 913(a) bestows on the military judge the discretion to give to the members those preliminary instructions which may be appropriate in a given case. There is no requirement that he describe capital sentencing procedures at that time, although he could certainly do so. In this case, the military judge gave these instructions following the sentencing arguments of counsel. We find this to have been lawful and completely appropriate, particularly in the absence of a defense request to give them earlier.
ISSUE XVI
THE MILITARY JUDGE ERRED IN FAILING TO INSTRUCT REGARDING ALCOHOL INTOXICATION AS A MITIGATING FACTOR.
The three persons who were with the appellant during the hours before Melinda’s murder all testified that the appellant was not drunk that night After his arrest nearly 4 months after the murder, the appellant told an investigator that he could not recall the events of the night of 9-10 December 1987 because he drank 18 beers and “two shots” that night. The defense did not request an instruction that intoxication be considered as a mitigating factor on sentencing.
As stated previously, we have found that voluntary intoxication was not reasonably raised by the evidence. Watford, 32 M.J. at 178-79. While the accused in Watford denied he was intoxicated, we view the truth of *584 the appellant’s self-serving statement to the investigator most doubtful and motivated to shield himself from criminal responsibility. It had no basis in fact and plainly conflicted with all of the other testimony in the case. As we said above, had he actually consumed this amount of alcohol, according to his counsels’ own calculations, he would have been dead. Additionally, it conflicts with the version he has submitted to this Court in his 1989 affidavit as the true story of what happened where he seems to recall the events of 9-10 December 1987 with great lucidness. Voluntary intoxication was not reasonably raised, and the military judge was not required to instruct on it. Failure to request the instruction on sentencing also waived the issue.
ISSUE XVII
THE MILITARY JUDGE ERRED IN FAILING TO INSTRUCT THE MEMBERS SUA SPONTE REGARDING THE DEFENSE OF VOLUNTARY INTOXICATION.
For similar reasons, we find no merit in this assignment of error. The defense specifically withdrew its request for a voluntary intoxication instruction on the merits of the case, and this decision was well-reasoned. Given all of the evidence, voluntary intoxication was not reasonably raised because there was no evidence to which the members could have attached any credence. Id. There was only the appellant’s incredible statement to the investigator. That was not enough, given the other testimony to reasonably raise the matter.
ISSUE XVIII
THE MILITARY JUDGE’S FAILURE, SUA SPONTE, TO INSTRUCT THE MEMBERS THAT EACH OF THEM COULD CONSIDER ANY MITIGATING FACTOR, OR FACTORS, FOUND BY THE INDIVIDUAL MEMBER IN DETERMINING WHETHER TO IMPOSE THE DEATH PENALTY WAS INADEQUATE GUIDANCE TO THEM IN THEIR DELIBERATIONS TO ENSURE A RELIABLE SENTENCING VERDICT.
The military judge instructed the members that they were required to consider all evidence in extenuation and mitigation and balance it against the aggravating circumstances. Such an instruction was correct. RCM 1004(b)(4)(C), (b)(6). He then summarized the evidence in mitigation and told the members that his summary was not intended to limit their consideration of all the matters presented at trial. We discern no possible confusion in this regard. There is no requirement that he instruct sua sponte that the “beyond a reasonable doubt” standard, which applied to the aggravating factors, did not apply to the defense’s extenuation and mitigation evidence. His directive to consider all evidence in extenuation and mitigation was sufficient and correct. We therefore resolve this issue against the appellant.
ISSUE XIX
THE MILITARY JUDGE ERRED BY FAILING, SUA SPONTE, TO INSTRUCT THE MEMBERS ON SENTENCING AS TO THE MEANING OF THE TERM “SUBSTANTIALLY OUTWEIGHED,” WITH REGARD TO THE RELATIONSHIP OF MITIGATING CIRCUMSTANCES TO AGGRAVATING CIRCUMSTANCES.
We resolve this issue against the appellant in light of the fact that it has previously been decided contrary to his assertion. Loving, 41 M.J. at 278-79.
ISSUE XX
THE MILITARY JUDGE’S INSTRUCTION THAT “YOU MAY NOT ADJUDGE A SENTENCE OF DEATH UNLESS YOU FIND THAT ANY AND ALL EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY ANY AGGRAVATING FACTORS ...” DID NOT SUFFICIENTLY INFORM THE MEMBERS THAT THIS FINDING MUST BE UNANIMOUS.
During his sentencing instructions, the military judge advised the members of the stepped procedure they were required to follow. First, he told them that “the death sentence may not be adjudged unless all the court members find, beyond a reasonable doubt, that one or more aggravating circumstances existed.” Second, he told them that *585 if all of them agreed that one or more of the aggravating factors existed, then “you may not adjudge a sentence of death unless you find that any and all extenuating and mitigating circumstances are substantially outweighed by any aggravating circumstances, including such circumstances that you have found existed in the first step of this procedure.” Finally, he told them that a sentence of death could only be adjudged upon a unanimous vote of all the members.
The appellant’s position is that the military judge did not specifically advise the members that they needed a unanimous vote in the second step. His argument is that the use of the word “you” could be interpreted either in the singular or the plural and could have misled the panel into thinking they were only required to find by a majority vote that the mitigating and extenuating circumstances were substantially outweighed by the aggravating circumstances.
We reject this argument for three reasons. First, we believe it was clear to the members, considering the instructions as a whole, that all of them had to concur in their determination on the weighing tier. Second, it would have been impossible under the military judge’s instructions for only a majority to find the extenuating and mitigating circumstances were substantially outweighed by the aggravating circumstances, and then have the very same members vote unanimously for death. Finally, this Court considered the same issue in Curtis and found it without merit. Curtis, 38 M.J. at 532, 549.
ISSUE XXI
THE MILITARY JUDGE ERRED IN FAILING TO EXPLICITLY INSTRUCT THAT EVEN IF THE MEMBERS UNANIMOUSLY FOUND ONE OR MORE AGGRAVATING FACTORS AND EVEN IF THE MEMBERS UNANIMOUSLY DETERMINED THAT THE EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS, EACH MEMBER STILL HAD THE ABSOLUTE DISCRETION TO DECLINE TO IMPOSE THE DEATH SENTENCE.
We also resolve this issue adversely to the appellant. Loving, 41 M.J. at 276-77; Curtis, 38 M.J. at 532, 549. We believe it was clear in this case, that the members understood they had the discretion not to adjudge death even if they unanimously found an aggravating factor and unanimously determined that the extenuating and mitigating circumstances were substantially outweighed by the aggravating circumstances. The instructions, considered as a whole, advised the members that they were not obliged to return a sentence of death simply because they found one or more aggravating factors and decided the weighing process contrary to the appellant’s arguments. The military judge specifically told the members that even if they found an aggravating factor, “then you may consider, along with other appropriate sentence possibilities, whether a sentence of death should be adjudged ...” (emphasis added). This left the discretion with the members to decline to adjudge a death sentence.
ISSUE XXII
THE MILITARY JUDGE’S INSTRUCTION DEFINING THE TERM “PREMEDITATION” WAS CONSTITUTIONALLY FLAWED BECAUSE IT ERASED THE DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER.
The military judge instructed the court members on premeditation as follows:
“Premeditated design to kill” means the formation of a specific intent to kill and consideration of the act intended to bring about death. The premeditated design to kill does not have to exist for any measurable or particular length of time. The only requirement is that it must precede the killing.
Record at 1457. The appellant did not object to this instruction and did not offer an alternative instruction at trial. He now argues that it is inconsistent to instruct that premeditation requires a consideration of the act and at the same time that it does not have to exist for any measurable period of time.
*586 MCM, Part IV, ¶ 43c(2)(a) states in pertinent part: “Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill have been entertained for any particular or considerable length of time.” The words “consideration of the act intended” are not terms of art, but have ordinary meanings. United States v. Hos-kins, 36 M.J. at 346; Teeter, 16 M.J. at 71-72. To sustain a conviction, the killing must have been committed after reflection by a cool mind. United States v. Viola, 26 M.J. 822 (A.C.M.R.), aff'd, 27 M.J. 456 (C.M.A 1988) (summary disposition), cert, denied, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989).
While his instruction did not follow the language contained in the MCM exactly, it was substantially correct. The inclusion of the word “measurable” did not result in any prejudice to the appellant’s substantial rights because the evidence in this case of premeditation hours before the murder was overwhelming. Furthermore, in the absence of plain error, the failure to object to the instruction at trial constitutes waiver. RCM 920(f). Therefore, we resolve this issue against the appellant.
ISSUE XXIII
THE MILITARY JUDGE SHOULD HAVE SPECIFICALLY INSTRUCTED THE COURT MEMBERS REGARDING APPELLANT’S LACK OF A CRIMINAL RECORD AS A MATTER IN MITIGATION.
We find no merit in this assignment of error in light of the fact that the Eighth Circuit case which is relied upon by the appellant was reversed by the Supreme Court, and the Court of Appeals later vacated its opinion. Lashley v. Armontrout, 957 F.2d 1495 (8th Cir.1992), rev’d sub nom. Delo v. Lashley, — U.S.-, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993), vacated, 993 F.2d 642 (8th Cir.1993). In the appellant’s case, no evidence was offered to establish the lack of a criminal record. Without establishing this fact, the trial judge was not obligated to instruct on it, a fortiori when no request for the instruction is made. RCM 920(f). We find the instructions which summarized the evidence in extenuation and mitigation were sufficient.
ISSUE XXIV
THE MILITARY JUDGE FAILED TO SPECIFICALLY ADVISE THE MEMBERS THAT ONLY A SINGLE VOTE WAS NEEDED TO DEFLECT THE DEATH SENTENCE AND COMPOUNDED THE PREJUDICE OF THIS OMISSION BY, IN FACT, ADVISING THE MEMBERS THAT APPELLANT COULD ONLY RECEIVE A LIFE SENTENCE IF TWO-THIRDS OF THE MEMBERS VOTED FOR LIFE IMPRISONMENT.
The appellant complains that because the military judge did not specifically instruct the court members that only a single vote would have deflected the death penalty that we should commute the sentence to life imprisonment or order a sentence rehearing. We do not agree. The military judge instructed the members of the requirement for unanimity in voting on the death penalty. The appellant did not object to this instruction or request another. Under these circumstances, we see no merit in the appellant’s complaint.
The fact that the military judge misinformed the members that only a two-thirds majority was necessary for a life sentence instead of the required three-fourths has been previously addressed in ISSUE VI and is again rejected for the same reasons.
ISSUE XXV
THE MILITARY JUDGE ERRED IN FAILING TO SUBMIT A SENTENCE WORKSHEET TO THE COURT MEMBERS WHICH CONTAINED SPECIAL FINDINGS REGARDING WHAT EVIDENCE WAS FOUND PERSUASIVE REGARDING THE INFLICTION OF “SUBSTANTIAL” PHYSICAL HARM THEREBY RENDERING IT IMPOSSIBLE TO DETERMINE THE MEMBERS’ FACTUAL BASIS FOR THEIR SENTENCE AND RENDERING REVIEW OF THEIR DECISION IMPOSSIBLE.
We resolve this issue against the appellant because there is no basis in law for *587 his assertion. Such a requirement would be within the authority of the Congress to impose in the UCMJ or the President in the MCM, but not this Court.
ISSUE XXVI
THE MILITARY JUDGE ERRED IN FAILING TO INSTRUCT ON THE DEFENSE OF DIMINISHED CAPACITY.
The defense of diminished capacity was not reasonably raised by the evidence. No psychiatric evidence was presented pertaining to the appellant’s mental status. Therefore, the military judge did not err in not giving such an instruction. The appellant cites the testimony of his excessive alcohol consumption to support his claim, but we have determined such an instruction did not have to be given regarding voluntary intoxication. The same is true for this issue.
ISSUE XXVII
THE MILITARY JUDGE ERRED BY FAILING TO PROVIDE A SUA SPONTE INSTRUCTION THAT VOLUNTARY INTOXICATION IS A DEFENSE TO THE SPECIFIC INTENT ELEMENT OF PREMEDITATED AND UNPREMEDITATED MURDER.
We reject this assignment of error for the reasons in our discussion on Issue XVII, supra.
ISSUE XXVIII
COURT-MARTIAL PROCEDURES DENIED APPELLANT HIS ARTICLE III RIGHT TO A JURY TRIAL.
The appellant asserts that, even though he is a member of the armed forces, he still has a right to trial by jury under Article III of the Constitution which states that “[t]he trial of all Crimes, except in Cases of Impeachment, shall be by Jury.” U.S. Const, art. Ill, § 2, cl. 3. He points out the lack of any exception for the land or naval forces, and that because the sole exception (impeachment cases) does not include military personnel, it is inappropriate for Congress to create such an exception.
Contrary to the appellant’s argument, however, we believe it is clear that the Supreme Court has held that Article III, as well as the Fifth and Sixth Amendments, do not require jury trials for all cases other than impeachment. Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942). We also find no merit in the appellant’s argument that he was not tried by a representative jury envisioned by Article III. United States v. Smith, 27 M.J. 242, 248 (C.M.A.1988).
ISSUE XXIX
THIS COURT SHOULD APPOINT A SPECIAL MASTER SUCH AS PROFESSOR DAVID S. BALDUS, AS A CONSULTANT ON PROPORTIONALITY TO ESTABLISH A DATABASE OF CASES TO FORM THE “UNIVERSE” OF CASES WITHIN WHICH TO CONDUCT PROPORTIONALITY REVIEW.
While not constitutionally required, a proportionality review of a death sentence is encompassed within the responsibility of the Courts of Criminal Appeals (formerly the Courts of Military Review) under their Article 66, UCMJ, determination of sentence appropriateness. Curtis, 32 M.J. at 270. Such a review need not be limited to death sentences from an accused’s own branch of service or even to sentences imposed by courts-martial. Id
In our most recent opinion in Curtis, we decided to consider cases from three sources in conducting the proportionality review: (1) post-Furman cases reviewed by the U.S. Supreme Court in which state courts have imposed the death penalty; (2) all military cases tried after August 1, 1984, and reviewed by a court of military review in which the court-martial adjudged the death penalty; and (3) all capital cases in the naval service tried after August 1, 1984, and reviewed by this Court in which the accused was eligible to be sentenced to death at the time of sentencing, regardless of whether he was sentenced to death or life imprisonment. 38 M.J. at 542-43. We are aware that the Army Court of Military Review in Loving used a more restricted “universe” of cases by reviewing only the state court cases that *588 were reviewed by the Supreme Court, United States v. Loving, 34 M.J. 956, 969 (A.C.M.R.1992), and that this procedure was affirmed by the Court of Appeals for the Armed Forces. 41 M.J. at 290-91. In this case, however, we have decided to examine the following classes of cases to conduct our proportionality review: 1) generally similar post-Furman cases reviewed by the U.S. Supreme Court in which state courts have imposed the death penalty; 2) all military cases tried after 1 August 1984, and reviewed by the appropriate Court of Military Review or Court of Criminal Appeals in which the trial court imposed the death penalty; and 3) all capital cases in the naval service tried after August 1, 1984, and reviewed by this Court in which the accused was death-eligible at the time of sentencing, irrespective of whether the accused was sentenced to death or life.
In light of the above, we decline his suggestion to appoint a special master to establish a database of cases for our proportionality review. It is neither necessary nor beyond this Court’s ability to formulate ourselves. United States v. Robinson, 39 M.J. 88 (C.M.A.1994); United States v. Garries, 22 M.J. 288 (C.M.A), cert, denied, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986).
ISSUE XXX
THE COURT’S MANNER OF CONDUCTING MANDATED PROPORTIONALITY REVIEW IS ERRONEOUS.
The scope of our proportionality review is broader — and more generous to the appellant — than that found adequate in Loving. 41 M.J. at 290-91. Therefore, the appellant can hardly be heard to complain that our manner of proportionality review is erroneous.
ISSUE XXXI
THE SENTENCE OF DEATH IN THIS CASE WAS DISPROPORTIONATE.
We have previously defined the “universe” of cases to conduct our proportionality review in this case. See Issue XXIX above. We have examined Harris v. Alabama, — U.S.-, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), Schiro v. Farley, — U.S.-, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994), Stansbury v. California, — U.S.-, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), Delo v. Lashley, — U.S. -, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993), Sawyer v. Whitley, 505 U.S. 333 (1992), Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), Lewis v. Jeffers, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), Heath v. Alabama, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In addition, we have examined all of the military cases cited in Curtis, 38 M.J. at 543 n. 16, as well as Curtis itself. We have found no additional military cases since our opinion in Curtis in 1993 which would fit into the universe of cases we have decided to examine.
Having done so, we conclude that the sentence in this case is generally proportional to those imposed in similar situations.
ISSUE XXXII
THE DEATH SENTENCE IS NOT AN APPROPRIATE SENTENCE IN THIS CASE.
We have very carefully considered all of the circumstances in this case and have determined that the death sentence is not inappropriate. We have also considered that, in the early stages of the case, the convening authority was willing to accept a negotiated guilty plea to voluntary manslaughter. The appellant, however, refused to plead guilty to any offense.
Notwithstanding the appellant’s clean record and family background presented in the sentencing hearing, the facts of the matter are that he bludgeoned his pregnant wife to death while she begged for her life. He did it to obtain money and to end what had *589 become an unhappy marriage. We find this to be a monstrous act deserving the ultimate punishment under the law. His sentence to death is appropriate.
ISSUE XXXIII
THE COURT’S FAILURE TO PROVIDE FUNDING FOR THE PSYCHOSOCIAL BACKGROUND INVESTIGATION REQUESTED BY APPELLATE DEFENSE COUNSEL DENIED APPELLANT HIS CONSTITUTIONAL RIGHT TO INDIVIDUALIZED SENTENCING AND MEANINGFUL APPELLATE REVIEW.
The appellant has twice requested and this Court has twice denied funding for a psychosocial background investigation of the appellant. United States v. Thomas, 33 M.J. 644 (N.M.C.M.R.1991); Thomas, No. 89 1289 (N.M.C.M.R. March 22, 1994) (order), pet. denied, 40 M.J. 24 (C.M.A.1994). He raises the issue now for a third time.
The use of an expert to prepare such an investigation is not required, even in a capital case. Loving 41 M.J. at 250. “What is required is reasonable investigation and competent presentation of mitigation evidence.” Id. As stated in Issue III, supra, we believe defense counsel adequately investigated the appellant’s background and competently presented a reasonable case in mitigation. The fact that they did not obtain the use of a psychosocial background investigation or produce every shred of information from the appellant’s youth and upbringing does not render them incompetent or ineffective. Numerous witnesses were called to testify, and substantial information on the appellant’s military career and background was presented. The appellant has not carried his burden to show that there is a reasonable probability that the expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Robinson, 39 M.J. at 89; Garries, 22 M.J. at 291. Accordingly, we resolve this issue against the appellant.
ISSUE XXXIV
THE MILITARY JUDGE ERRED BY ALLOWING THE TRIAL COUNSEL TO SET UP A PHOTO BOARD WHICH OBSTRUCTED APPELLANT’S VIEW OF THE WITNESS STAND IN VIOLATION OF THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
There is no indication in the record that the photo board obstructed the appellant’s view of the witness stand. No such objection was ever lodged during trial. Thus, this issue, even if its factual premise is true, was waived. RCM 905(e).
ISSUE XXXV
THE MILITARY JUDGE ERRED IN ADMITTING INTO EVIDENCE PROSECUTION EXHIBITS 21 THROUGH 23, AND 25 THROUGH 31, X-RAYS, WHERE THE X-RAYS WERE NOT MADE BY A QUALIFIED X-RAY TECHNICIAN.
Several x-rays of Melinda’s body and skull were received into evidence over defense objection. The basis for the objection was that Mr. Wasson, a county forensic technician and coroner’s assistant, was not a qualified x-ray technician and therefore could not properly authenticate the x-rays. Mr. Wasson stated that he had been trained to take forensic x-rays by a forensic embalmer to “determine broken bones,” teeth structure, or any abnormalities in a body that might help to identify it. His experience included having taken 4,000 to 5,000 x-rays of 500 to 600 persons. He admitted he was not formally designated as an x-ray technician and was not “school trained.”
We find that the military judge did not abuse his discretion in admitting the x-rays. An expert’s qualifications can be based on “knowledge, skill, experience, training or education” and the expert’s testimony need only “assist the trier of fact” to understand the evidence. Mil.R.Evid. 702. Mr. Wasson, while not formally trained, met this standard. He had extensive experience and knowledge, and we believe his testimony assisted the court members and was properly admitted. United States v. Houser, 36 M.J. 392, 397-98 *590 (C.M.A.1993), cert, denied, — U.S.-, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993); United States v. Stark, 30 M.J. 328, 330 (C.M.A. 1990).
ISSUE XXXVI
THE MILITARY JUDGE ERRED IN ADMITTING INTO EVIDENCE PROSECUTION EXHIBIT 41, A DENTAL X-RAY, WHERE THE X-RAY WAS NOT MADE BY THE WITNESS WHO USED IT DURING HIS TESTIMONY.
Dr. O’Brien, a dentist who had formerly treated Melinda Thomas, identified Prosecution Exhibit 41 as a set of dental x-rays of Melinda which were taken in his office in 1983. He stated he was in his office when the x-rays were taken, but he himself did not take them. The doctor identified the handwriting of his x-ray technician on the x-ray charts. These charts were forwarded to the county coroner’s office to help identify Melinda’s remains. We find no abuse of discretion in admitting this exhibit.
ISSUE XXXVII
THE MILITARY JUDGE ERRED IN ADMITTING INTO EVIDENCE PROSECUTION EXHIBIT 20 AFTER HE HAD DETERMINED THAT THE GOVERNMENT HAD FAILED TO PROVIDE A SUFFICIENT FOUNDATION FOR ADMITTANCE.
The appellant complains that the military judge erred in admitting Melinda’s death certificate (which appellant refers to as Prosecution Exhibit 20, but was Prosecution Exhibit 11) into evidence because of a lack of sufficient foundation. We find no abuse of discretion in admitting Prosecution Exhibit 11 because prior to admitting it, the military judge heard the testimony of Doctor Freeman who compared the x-rays of the remains with Melinda’s dental charts and gave his opinion that they were an exact match. Also, the military judge did not abuse his discretion in admitting Prosecution Exhibit 20, the autopsy memorandum.
ISSUE XXXVIII
THE MILITARY JUDGE ERRED IN ADMITTING INTO EVIDENCE PROSECUTION EXHIBIT 42, JAW X-RAYS, WHERE THE X-RAYS WERE NOT MADE BY THE WITNESS WHO USED THEM DURING HIS TESTIMONY.
Prosecution Exhibit 42 consists of 7 dental x-rays. Dr. Freeman testified that he took the x-rays in Prosecution Exhibit 42, and processed and mounted them himself. He was actually the best witness to authenticate this exhibit. Again, there was no abuse of discretion by the military judge regarding the admission into evidence of these x-rays. The jaw was removed from the body by the pathologist during the autopsy and Dr. Freeman took the x-rays at the same location where the jaw was removed.
XXXIX
THE CONVENING AUTHORITY ABUSED HIS DISCRETION IN DENYING APPELLANT’S REQUEST FOR A PERSONAL APPEARANCE BEFORE THE CONVENING AUTHORITY TO PRESENT HIS CASE FOR CLEMENCY.
Following trial, but before the convening authority acted, the appellant, through counsel, requested a personal appearance before the convening authority. The convening authority denied the request. RCM 1105 provides that after a sentence is adjudged, an accused may submit to the convening authority written matters that may reasonably tend to affect the convening authority’s decision whether to approve or disapprove the findings or the sentence. See also Article 60(b), UCMJ, 10 U.S.C. § 860(b) (1994). He has no right to a personal appearance with the convening authority, although the convening authority may afford him such an audience should it be deemed appropriate. Such a decision is solely within the convening authority’s discretion. Therefore, the failure to provide the appellant with a personal appearance to argue for clemency is not a matter of right, and the appellant has failed to produce any evidence that the convening authority abused his discretion by not affording the appellant that opportunity.
*591 ISSUE XL
THE CONVENING AUTHORITY ABUSED HIS DISCRETION IN DENYING APPELLANT’S REQUEST THAT HIS CIVILIAN TRIAL DEFENSE COUNSEL MR. ALCORN BE GIVEN THE OPPORTUNITY TO MAKE A PERSONAL APPEARANCE ON BEHALF OF APPELLANT, BEFORE THE CONVENING AUTHORITY, TO PRESENT APPELLANT’S CASE FOR CLEMENCY.
We resolve this issue against the appellant for the same reasons mentioned in the previous issue.
ISSUE XLI
THE MILITARY JUDGE ABUSED HIS DISCRETION IN REFUSING TO GRANT APPELLANT’S PRETRIAL REQUESTS FOR THE RANDOM SELECTION OF MEMBERS; 20 PEREMPTORY CHALLENGES; AND VOIR DIRE OF THE MEMBERS REGARDING THEIR VIEWS ON THE DEATH PENALTY ONLY IF A UNANIMOUS CONVICTION FOR PREMEDITATED MURDER OCCURRED.
In a pretrial hearing, the appellant made several motions. He requested the military judge to depart from the normal manner in which court members are selected, to increase the number of peremptory challenges afforded the defense from 1 to 20, and to postpone the portion of voir dire regarding the members’ attitudes toward capital punishment until after findings were entered. The military judge denied these motions, and the appellant now argues the judge abused his discretion in making these rulings. We disagree with the appellant’s conclusion.
Article 25(d)(2), UCMJ, states that when selecting members to serve on a court-martial, a convening authority shall detail members who “are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament.” 10 U.S.C. § 825(d)(2) (1994). The appellant has presented no evidence that the convening authority did anything but follow this statute. In the absence of evidence to the contrary, there was no basis to grant the appellant’s motion for a random selection of the members. See United States v. Van Steenwyk, 21 M.J. 795, 812 (N.M.C.M.R. 1985).
Regarding the second motion to increase the number of peremptory challenges, Article 41(b)(1), UCMJ, provides that each of the parties is initially entitled to one peremptory challenge. 10 U.S.C. § 841(b)(1) (1994). Article 41(c) allows another peremptory challenge for use involving additional members appointed to the court who were not subject to the first peremptory challenge. 10 U.S.C. § 841(c) (1994). In this case, no additional members were appointed to the original panel, and the military judge permitted each side only one peremptory challenge.
The appellant relies heavily on United States v. Carter, 25 M.J. 471 (C.M.A.1988). However, Carter dealt with the question of an additional peremptory challenge in a case where additional members were appointed because the court-martial had fallen below a quorum. The Court held that when new members are detailed to the panel, an additional peremptory challenge must be allowed. Article 41(c) of the Code, which was enacted as a part of the Defense Authorization Act, 5 November 1990, Pub.L. 101-510, § 541(d), 104 Stat. 1565 (codified at 10 U.S.C. § 841(c) (1994)), incorporates into statute the Court’s opinion in Carter. Neither the UCMJ, the MCM, nor case law authorizes 20 peremptory challenges to an accused, even in a capital case. Therefore, the military judge did not abuse his discretion in denying the appellant’s motion.
Lastly, the appellant argues that the military judge abused his discretion in denying his motion that the members not be “death qualified” until after they had returned with a unanimous verdict on the charge of premeditated murder. The appellant argues that if the members are aware that they may eventually have to vote on the death penalty, they are more likely to convict the accused of premeditated murder. However, in light of the Supreme Court’s opinion in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), we hold that there is no prohibition on “death qualifying” court-martial members prior to the guilt *592 phase of a bifurcated capital case. Consequently, the military judge did not abuse his discretion in this instance.
ISSUE XLII
THE STAFF JUDGE ADVOCATE WAS DISQUALIFIED FROM CONDUCTING THE POST-TRIAL REVIEW WHEN HE HAD ISSUED A LEGAL OPINION TO MR. NELSON THAT HIS TESTIMONIAL IMMUNITY WAS STILL VALID, AN ISSUE THAT WAS CONTESTED AT TRIAL.
Mr. Nelson, the prosecution’s only eyewitness to the murder of Melinda Thomas, was on active duty in the Marine Corps until his discharge on 17 June 1988. He testified at trial as a civilian. Before his discharge, the convening authority issued Nelson a grant of immunity, dated 11 March 1988. On 24 October 1988, the staff judge advocate signed a letter to Nelson that stated that the grant of immunity given to him while on active duty was still valid and in effect in spite of his change to civilian status. When Nelson appeared at the appellant’s trial on the same date, he refused to testify because he had been told by a Marine Corps lawyer that the grant of immunity was no longer valid. The military judge shared the staff judge advocate’s opinion and directed Nelson to testify. Nelson said he wanted to consult with a civilian attorney first. After consulting with an attorney, Nelson decided to testify against the appellant.
The staff judge advocate, in his post-trial recommendation to the convening authority, did not discuss the issue of the validity of Nelson’s immunity. In the appellant’s response, an objection was made to the staff judge advocate providing post-trial advice because he had taken a position on the issue of Nelson’s immunity and that issue was being argued in the reply. Both then and now, the appellant argues that the staff judge advocate was disqualified because he was in effect reviewing his own advice on a contested issue.
We do not believe that the staff judge advocate was disqualified in this case. He did not act in any of the prohibited capacities listed in RCM 1106(b). Also, he did not testify at trial, his Article 34, UCMJ, 10 U.S.C. § 834, pretrial advice went unchallenged, and he had nothing other than an official interest in the case. United States v. Collins, 6 M.J. 256 (C.M.A.1979). Issuing an opinion as to the validity of a witness’ immunity grant was not a matter that would have disqualified the staff judge advocate. This was a collateral issue to the appellant’s trial which was not factual in nature and had no bearing, in and of itself, on the guilt or innocence of the appellant. United States v. Lynch, 39 M.J. 223 (C.M.A.1994). It only affected whether Nelson could later be prosecuted. It did not affect the staff judge advocate’s impartiality or objectivity. Therefore, we resolve this issue against the appellant.
ISSUE XLIII
THE ACCUSED WAS DENIED A FAIR AND IMPARTIAL HEARING BECAUSE OF ADVERSE PRETRIAL PUBLICITY.
Citing pretrial publicity and the convenience of the parties, the defense moved for a change of venue. It cited various newspaper articles regarding the case and noted the fact that the appellant was not confined at Marine Corps Air Station, El Toro, but at Camp Pendleton, and was therefore required to commute over 3 hours each day of trial. Apparently, El Toro did not have the facilities to confine the appellant.
The military judge was aware that there had been some media coverage. He ordered all of the prospective members to avoid any accounts of the incident involving Melinda Thomas and not to discuss the case with anyone. Appellate Ex. X. The members agreed to abide by the order. Of the nine members who ultimately sat on the court, four had not heard anything about the case. Each of the remaining five members stated that any determination he would make at the trial would be based solely on the evidence presented and not what he had heard or read.
The law is clear that “an accused is entitled to a change of venue only when pretrial publicity creates ‘so great a prejudice against *593 the accused that the accused cannot obtain a fair and impartía] trial.’ ” Loving, 41 M.J. at 282 (quoting RCM 906(b)(11) discussion). The focus is not on whether there has been publicity, but rather on the impact it may have had on the court members ability to render a fair and impartial decision. United States v. Calley, 22 U.S.C.M.A. 534, 48 C.M.R. 19, 1973 WL 14894 (1973). The ruling of the military judge on a motion for change of venue is reviewed for abuse of discretion. Loving, 41 M.J. at 282; United States v. Carter, 9 U.S.C.M.A. 108, 112, 25 C.M.R. 370, 374, 1958 WL 3173 (1958).
Based on the circumstances here, we do not find an abuse of discretion. The decision of the members was not influenced by the publicity of the case. From the original panel, one member was removed by the military judge sua sponte. The defense challenged only one other member for cause, and this challenge was not based on any influence from the pretrial publicity. We also find no abuse of discretion for not changing venue based on the convenience of the appellant.
ISSUE XLIV
TRIAD COUNSEL ENGAGED IN IMPROPER AND UNLAWFULLY INFLAMMATORY ARGUMENT AND ACTIONS DURING THE GUILT PHASE OF THE TRIAL BY EXPRESSING PERSONAL OPINIONS, CONTINUALLY REFERRING TO APPELLANT AS “LIAR,” AND BRANDISHING A TIRE IRON IN VIEW OF THE MEMBERS, DEPRIVING APPELLANT OF A FAIR AND IMPARTIAL TRIAL.
The appellant argues that the trial counsel engaged in improper argument by giving his personal opinion as to how someone would commit suicide by driving over a cliff, by calling the appellant a liar, and by brandishing a tire iron. Defense counsel did not object to any of these alleged improprieties. Failure to object to improper argument constitutes waiver. RCM 919(c). Plain error will be found only where the error is serious and substantial and had an obviously unfair and prejudicial impact on the members’ deliberations. United States v. Kropf, 39 M.J. 107 (C.M.A.1994); see also United States v. Kirks, 34 M.J. 646 (A.C.M.R.1992); United States v. Carroll, 34 M.J. 843 (A.C.M.R.1992).
Trial counsel did not express a “personal opinion” in his argument. By stating that someone who was committing suicide would not drive over a cliff at a slow rate of speed, he was arguing a matter of common sense, not personal knowledge. By calling the appellant a liar, trial counsel struck hard, but we believe fair blows. United States v. Doctor, 7 U.S.C.M.A. 126, 21 C.M.R. 252, 1956 WL 4578 (1956). His comments were based on the evidence of record that the appellant had related false accounts about Melinda’s whereabouts to conceal his crime. They did not have an unfair prejudicial impact on the members’ deliberations, or amount to plain error. They did not imply, as the appellant argues in footnote 167 of his brief, that the appellant did not testify at trial because he was a liar. As for the “brandishing” of a tire iron during argument, there is nothing in the record of trial to support such an allegation. The trial counsel did try to enter a Suzuki tire iron into evidence, but was unsuccessful. The actual murder weapon was never recovered. While he may have handled a tire iron during the trial, given the lack of objection during his argument on this matter, we find no plain error in this case and no prejudicial effect.
ISSUE XLV
THE MILITARY JUDGE ABUSED HIS DISCRETION IN APPLYING THE LIBERAL-GRANT MANDATE BY IMPROPERLY DENYING THE CHALLENGE FOR CAUSE OF COLONEL COOP.
During voir dire, Colonel Coop, a court member, indicated that he was assigned to the convening authority’s staff as comptroller, had a close working relationship with the convening authority, and spoke with him “daily to every other day.” He had not discussed the topic of military justice with the convening authority and was unaware of his views on military justice and discipline. Colonel Coop did not think there would be any repercussions as a result of the trial and did not believe the convening authority would *594 be disappointed if the appellant were acquit ted.
Colonel Coop was also asked about his views on sentencing. After initially indicating concurrence with the concept of “an eye for an eye,” he stated he did not believe that someone who was responsible for another’s death must automatically forfeit his own life. He added that the punishment should fit the crime and that he would vote against the death penalty if warranted, even if other members disagreed. He also said that persons convicted of certain crimes could not be rehabilitated, but then conditioned that answer by indicating he was referring to repeat offenders. He said that he would not reach an automatic sentence in this case and would be able to hear all of the evidence before discussing and considering a sentence.
The defense challenged Colonel Coop for cause, arguing two bases: that his close working relationship with the convening authority precluded his participation as a member, and that he had an inelastic attitude toward sentencing. The military judge denied the challenge. The defense then used its peremptory challenge against Colonel Coop and indicated it would have used it against another member had the challenge for cause been granted. The appellant now argues that the military judge abused his discretion due to the Colonel’s close relationship to the convening authority in the context of a capital case.
The law is well-established that challenges for cause are to be granted liberally, but the ruling of the military judge will not be disturbed absent a clear abuse of discretion in applying the liberal-grant mandate. United States v. McLaren, 38 M.J. 112, 118 (C.M.A.1993), cert, denied, — U.S. -, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994); United States v. Coppock, 37 M.J. 145, 151 (C.M.A.1993), cert, denied sub nom. Toro v. United States, — U.S.-, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994); United States v. White, 36 M.J. 284, 287 (C.M.A.1993), cert, denied sub nom. Curtis v. United States, — U.S. -, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994).
We find no abuse of discretion in denying the challenge for cause. The fact that Colonel Coop worked closely with the convening authority as his comptroller was not disqualifying in the absence of some indication that Colonel Coop’s decision-making process would have been influenced by the relationship. United States v. Ambalada, 1 M.J. 1132 (N.C.M.R.1977). There is no such indication in this record. We also specifically reject the appellant’s suggestion that a separate standard should be applied here because it was a capital case. He is basically arguing the doctrine of in favorem vitae, which advocates a more pro-defendant approach in capital cases. However, this doctrine has been rejected by both the U.S. Supreme Court and the Court of Appeals for the Armed Forces. Smith v. Murray, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); Loving 41 M.J. at 266.
As for the second basis for the challenge, we have concluded from Colonel Coop’s responses that he did not have an inelastic attitude toward sentencing. His mind was open as to sentencing alternatives, and he indicated that he would listen to the evidence before considering a possible sentence. While this is a closer issue than that contained in the first basis for challenge, we believe the ruling of the military judge was within his discretion and will not be overturned on appeal.
ISSUE XLVI
THE MILITARY JUDGE ERRED BY DENYING THE DEFENSE MOTION IN LIMINE TO EXCLUDE PROSECUTION EXHIBIT NINE, A PHOTOGRAPH SHOWING THE VICTIM’S SKULL WHICH WAS MORE PREJUDICIAL THAN PROBATIVE.
Prosecution Exhibit 9 is a color photograph depicting Melinda’s charred remains in the Suzuki as they were found by police investigators on the morning of 10 December 1987. The view in the photo is from above, looking down toward the top of her skull. No blood is visible. Most of her remains are black from the burning. The photograph illustrates that her body remained in the *595 vehicle, shows the space around her in the vehicle, and indicates the minimal amount of crash damage to the vehicle.
The defense moved to exclude the photograph from evidence, arguing that it was highly prejudicial and inflammatory, and that it was intended to shock the members. See Mil.R.Evid. 403. The military judge overruled the objection and admitted the photograph into evidence after hearing testimony relating to its probative value.
Our review of the exhibit leads us to conclude that the military judge’s ruling was correct. The photograph was certainly relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice. United States v. Burks, 36 M.J. 447 (C.M.A), cert, denied, 114 S.Ct. 187, 126 L.Ed.2d 146 (1993); United States v. White, 23 M.J. 84 (C.M.A.1986). The prosecution had legitimate purposes for introducing the photograph. It showed that due to the amount of space in the vehicle, the skull injuries did not result from the crash, that the Suzuki was not crushed or severely damaged in the incident, indicating low speed, and the fire was very intense, which corroborated Nelson’s testimony of the large amount of accelerant the appellant poured on it prior to pushing it over the cliff. It was also used to illustrate the testimony of the prosecution’s expert witness, Dr. Wagner. Therefore, we resolve this issue in the Government’s favor.
ISSUE XLVII
THE MILITARY JUDGE FAILED TO PROVIDE APPELLANT WITH FARETTA WARNINGS BECAUSE COUNSEL DID NOT MEET THE ABA/NLADA STANDARDS FOR COUNSEL IN CAPITAL CASES.
In Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that a criminal defendant was entitled to defend himself at his trial when he made known his desire to do so to the trial judge and his defense counsel. Here, the appellant never requested to proceed pro se, and he was defended by two certified defense counsel. Under such circumstances, the military judge was under no obligation to advise sum sponte the appellant of his right under Faretta. Moreover, the Court in Loving expressly declined to mandate compliance with American Bar Association standards for counsel in capital cases in the military system. 41 M.J. at 300.
ISSUE XLVIII
THE CONVENING AUTHORITY IS FACED WITH AN INHERENT CONFLICT OF INTEREST BETWEEN, ON THE ONE HAND, CHOOSING A PANEL OF COURT MEMBERS AND TRIAL COUNSEL, FROM MILITARY SUBORDINATES WHOSE CAREERS HE CAN DIRECTLY AND IMMEDIATELY AFFECT AND CONTROL, TO PROSECUTE AND TO DECIDE A CAPITAL CASE FOR OFFENSES THAT OCCUR ON THE CONVENING AUTHORITY'S BASE AND, ON THE OTHER HAND, THE CONVENING AUTHORITY’S DUTY TO BE NEUTRAL AND IMPARTIAL AND THE TRIAL COUNSEL’S AND COURT MEMBER’S DUTY TO BE NEUTRAL AND IMPARTIAL IN PROSECUTING AND IN DETERMINING THE CONTROVERTED FACTS IN THE CASE.
We resolve this issue against the appellant. See Article 25(d)(1), UCMJ, 10 U.S.C. § 825(d)(1) (1994); United States v. Gray, 37 M.J. 751, 755 (A.C.M.R.), mandatory review filed, 38 M.J. 305 (C.M.A.1993).
ISSUE XL IX
APPELLANT WAS DENIED HIS FOURTEENTH AND FIFTH AMENDMENT RIGHTS TO EQUAL PROTECTION AND DUE PROCESS OF LAW BY UNLAWFUL COMMAND ACTION IN DETAILING ALL MALE PANEL MEMBERS, INTENTIONALLY DISCRIMINATING AGAINST WOMEN BY EXCLUDING THEM FROM THE COURT.
The convening authority appointed twelve men to this court-martial. Nine of them eventually heard the appellant’s case. The appellant now argues, without having raised the issue below, that his constitutional rights were violated because no women were appointed to his panel. As was the case in Loving, we find that the appellant has not *596 made a prima facie showing of gender discrimination. 41 M.J. at 283-87. Additionally, he has waived the issue because of his failure to make this objection at trial. RCM 905(e).
ISSUE L
THE LOWER COURT ERRED IN ALLOWING A MEMBER TO REMAIN ON A CAPITAL CASE WHILE THE CONVENING AUTHORITY WAS HIS REVIEWING SENIOR, DENYING THE ACCUSED HIS RIGHT TO A FAIR AND IMPARTIAL HEARING IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
The appellant maintains in this assignment of error that the military judge has a sua sponte obligation to excuse any member when that member’s evaluation is reviewed by the convening authority. In this case, Lieutenant Colonel [LtCol] Kurth’s reviewing officer was General Miller, the convening authority. The defense did not challenge LtCol Kurth for cause.
This argument lacks merit for at least two reasons. First, the military judge has no sua sponte obligation to excuse a court member merely because the convening authority is the reviewing officer for the member’s evaluation. Ambalada, 1 M.J. at 1135. If the member may be subject to external influence because of this, then he may be challenged, but he is not disqualified simply because the convening authority is involved in writing his evaluation. Second, by failing to challenge LtCol Kurth for cause, the appellant has waived the issue. RCM 912(f)(4). No different rule applies in capital cases.
ISSUE LI
APPELLANT WAS DENIED THE OPPORTUNITY TO FULLY PREPARE FOR THE SENTENCING PHASE OF TRIAL BECAUSE TRIAL COUNSEL FAILED TO PROVIDE APPELLANT WITH NOTICE OF THE FACTS ALLEGEDLY SUPPORTING THE AGGRAVATING FACTORS.
While RCM 1004(b)(1) requires the trial counsel to give written notice to the defense prior to arraignment of which aggravating factors the prosecution intends to prove, it does not require any notice regarding the facts the prosecution intends to rely upon to prove those factors. Here, trial counsel provided the defense with appropriate notice of the aggravating factors the prosecution intended to prove. The appellant never objected at trial that he was misled or prejudiced in this regard. The evidence which tended to support the factors alleged in this case was available to the defense through the discovery process and pretrial investigation. The prosecution fully complied with its notice requirements. Any further requirement to disclose facts which support the aggravating factors is a matter left to Congress or the President, but not this Court.
ISSUE LII
APPELLANT WAS DENIED A FAIR TRIAL BECAUSE HE WAS ENTITLED TO HAVE A SHOW CAUSE HEARING PRIOR TO THE GOVERNMENT SEEKING THE DEATH PENALTY.
The appellant argues that the Government should have been required to substantiate its reasons for seeking the death penalty in a pretrial show cause hearing. We reject this assertion because there is no basis in law or military procedure for it. The appellant was afforded every procedural right to which he was entitled in this case. We decline to judicially create the additional step the appellant now seeks. Moreover, this objection was not raised at trial and was therefore waived. RCM 905(e).
ISSUE LIII
THE COURT MEMBERS WERE IMPROPERLY ALLOWED TO CONSIDER THE PROSECUTOR’S “VICTIM IMPACT” ARGUMENT ON SENTENCE.
During his sentencing argument, the trial counsel spoke of the gravity of the loss of Melinda’s life. He stated she would never *597 be able to experience all of the joys, sorrows, dreams, and hopes one would go through in a lifetime. He went on to discuss how the appellant’s acts would affect not only other members of Melinda’s family, but the appellant’s family as well, including his wife, Linda. The appellant argues that such an argument was improper and justifies a rehearing on sentence. We disagree with the appellant and resolve this issue against him.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the U.S. Supreme Court held that in a capital case the Eighth Amendment did not bar either a jury from considering victim impact evidence relating to the victim’s personal characteristics and the emotional impact of the murder on the victim’s family or the prosecutor’s arguing such at a sentence hearing. Gray, 37 M.J. at 739. In courts-martial, RCM 1001(b)(4) governs what evidence can be considered in aggravation. It permits “evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty.” The discussion following the rule specifically states that such evidence may include victim impact evidence. Also, in this case, the defense did not object to the trial counsel’s argument, thereby waiving the issue. RCM 1001(g). We find no plain error on this issue.
ISSUE LIV
THE MILITARY JUDGE ERRED BY HOLDING THE TRIAL AT A LOCATION HINDERED BY AIRCRAFT NOISE IN VIOLATION OF APPELLANT’S RIGHT TO A FAIR TRIAL UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
In his brief, the appellant argues aircraft noise interrupted his trial 78 times, depriving him of the ability to fully comprehend the proceedings. The court-martial was held at a Marine Corps Air Station. Our examination of the record indicates that aircraft noise did interrupt the proceedings at various times, but when this occurred, there were pauses in the proceedings to allow the aircraft to pass before any further discussions or testimony took place. We find the record to be a complete verbatim record, and the appellant never objected that he could not hear what transpired at trial. Therefore, the appellant was not denied a fair trial, and his substantial rights were not affected adversely because of the aircraft noise. His lack of objection has also waived the issue.
ISSUE LV
APPELLANT IS ENTITLED TO REPRESENTATION BY COUNSEL QUALIFIED UNDER THE AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ON APPEAL AND TO UNINTERRUPTED CONTINUITY OF COUNSEL UNAFFECTED BY PEACETIME MILITARY PERSONNEL DECISIONS.
This issue has been resolved against the appellant. Loving, 41 M.J. at 298-300. The appellant has been represented at trial and on appeal by effective and zealous counsel with a degree of competence well above constitutional minimums. Continuity of counsel has not been a major problem in this case. The appellant has been represented by only two lead appellate defense counsel since 1989.
ISSUE LVI
APPELLANT DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS ARTICLE 38(b)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(b)(3)(B) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION WHERE MILITARY COUNSEL FAILED TO ADVISE APPELLANT OF HIS PROFESSIONAL DEFICIENCIES (WHICH INCLUDED NO CAPITAL EXPERIENCE, NO CAPITAL TRAINING, AND NO EXPERIENCE IN DEFENDING A MURDER CHARGE) AND FAILED TO ADVISE APPELLANT THAT HE HAD DETAILED HIMSELF TO THE CASE.
Article 38(b), UCMJ, provides that in addition to defense counsel detailed to defend the accused, he may be represented by military counsel of his own selection if *598 that counsel is reasonably available. Also, the accused may retain civilian counsel to represent him in addition to his military counsel. 10 U.S.C. § 838(b) (1994). In this case, the appellant retained a civilian counsel for the Article 32, UCMJ, pretrial investigation. The appellant then decided to release his civilian counsel and obtain a military counsel of his own selection, Major Stevens, to join his detailed defense counsel, Major Renner. The appellant waived representation by civilian counsel at trial following an appropriate rights advisement.
The appellant argues that he was denied that counsel to which he was entitled in a capital case because neither of his trial advocates informed him of their lack of experience in defending capital murder cases. However, we have found that counsel in this case met constitutional mínimums of effective assistance and were not required to be certified under guidelines of the American Bar Association. They were also not required to withdraw from the case because they had never tried such a capital case before. They adequately prepared themselves for this case and, from an objective viewpoint, did not display serious deficiencies. The appellant has the right to no more. See Curtis, 38 M.J. at 532, 546.
ISSUE LVII
APPELLANT DID NOT KNOWINGLY AND INTELLIGENTLY EXERCISE HIS ARTICLE 38(b)(2) STATUTORY RIGHT TO CIVILIAN COUNSEL AND HIS ARTICLE 38(b)(3) STATUTORY RIGHT TO MILITARY COUNSEL OF HIS OWN SELECTION BECAUSE THE MILITARY JUDGE MISLED APPELLANT BY DISCUSSING HIS COUNSEL’S “QUALIFICATIONS,” WHEN NEITHER COUNSEL HAD TRIED A CAPITAL CASE TO CONCLUSION, OR RECEIVED DEATH PENALTY CONTINUING LEGAL EDUCATION.
The military judge did not mislead the appellant. He advised him of his counsel rights in accordance with Article 38(b), UCMJ; RCM 901(d)(4); and United States v. Donohew, 18 U.S.C.M.A 149, 39 C.M.R. 149, 1969 WL 5933 (1969). Counsel were qualified under the law to defend the appellant. The military judge was not required to further advise him regarding counsel’s experience level before the appellant could knowingly and intelligently exercise his Article 38(b) rights, nor to query counsel in this regard. See Curtis, 38 M.J. at 532, 546.
ISSUE LVIII
THE MILITARY JUDGE ERRED IN FAILING TO INQUIRE AS TO THE IDENTITY AND PRACTICE OF THE AUTHORITY WHO DETAILED MILITARY DEFENSE COUNSEL AND IN FAILING TO ENSURE THAT COUNSEL WERE QUALIFIED IN TRAINING, EXPERIENCE, AND EDUCATION TO DEFEND A CAPITAL CASE.
For the reasons stated above, we also resolve this issue against the appellant. There is no requirement in the Code, the MCM, or military case law for what the appellant proposes. See also Loving, 41 M.J. at 300. From the record, it is clear that the appellant knew Major Renner had detailed herself to the case. Additionally, the appellant himself requested and obtained Major Stevens as his individual military counsel. See Curtis, 38 M.J. at 532, 546.
ISSUE LIX
ARTICLE 18, U.C.M.J., 10 U.S.C. § 818, AND R.C.M. 201(f)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATE THE FIFTH AND EIGHTH AMENDMENT GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT.
This issue has also been recently resolved against the appellant. Loving, 41 M.J. at 291 (citing Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) and United States v. Matthews, 16 M.J. 354, 363 (C.M.A.1983)); Curtis, 38 M.J. at 532, 546.
ISSUE LX
THE CAPITAL PUNISHMENT PROCESS UNDER WHICH APPELLANT WAS SENTENCED TO DEATH IS INVALID BECAUSE IT IS AN IMPERMISSIBLE EXTENSION OF PRESIDENTIAL POWER.
This assignment of error has been found meritless in various cases and will not be *599 discussed further here. Loving, 41 M.J. at 293; Curtis, 32 M.J. at 260-67; Matthews 16 M.J. at 380.
ISSUE LXI
ARTICLE 25(c)(l)’S EXCLUSION FROM COURT-MARTIAL SERVICE OF ENLISTED MEMBERS OF THE SAME UNIT AS THE ACCUSED INJECTS AN IMPROPER CRITERION (ENLISTED STATUS) IN SELECTING THE MEMBERS POOL.
We rejected this contention in Curtis, 38 M.J. at 532, 546, and do so again.
ISSUE LXÍI
THE IMPOSITION OF THE DEATH PENALTY ON APPELLANT VIOLATED HIS RIGHTS TO EQUAL PROTECTION AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION BECAUSE R.C.M. 1004 SUBJECTED APPELLANT, AS A MEMBER OF THE ARMED FORCES, TO A PENALTY WHICH IS NOT OTHERWISE AVAILABLE UNDER FEDERAL JURISDICTION FOR IDENTICAL CRIMINAL CONDUCT.
This argument has recently been rejected by the Court of Appeals for the Armed Forces in Loving, 41 M.J. at 294.
ISSUE LXIII
THE CONVENING AUTHORITY DID NOT UNDERSTAND THE LAW AND HIS OPTIONS (INCLUDING DETAILING AN ALL-ENLISTED COURT AND RANDOM SELECTION OF MEMBERS FOR HIS FURTHER SCREENING) REGARDING DETAILING ENLISTED MEMBERS PURSUANT TO ARTICLE 25.
This assignment of error is clearly speculative in its assumption as to what the convening authority did or did not understand when he detailed members to the appellant’s court-martial. The fact that the convening authority did not detail all enlisted members to the court does not necessarily mean that he did not understand his options under Article 25, UCMJ. Another reasonable interpretation of his action is that he knew of his options but decided to appoint the members he did. There is nothing in the record to substantiate the appellant’s claim or to indicate that the convening authority did anything other than follow the requirements of Article 25, UCMJ, that he select members based on their age, training, experience, judicial temperament, education, and length of service. The convening authority’s actions are accorded a presumption of regularity, and the burden for establishing improper selection of members is on the appellant. United States v. Cunningham, 21 M.J. 585, 586-87 (A.C.M.R.1985). He has not carried his burden on this issue.
ISSUE LXIV
THE FIFTH, SIXTH AND EIGHTH AMENDMENTS DO NOT PERMIT, IN PEACETIME, A CONVENING AUTHORITY TO HAND-PICK MILITARY SUBORDINATES, WHOSE CAREERS HE CAN DIRECTLY AND IMMEDIATELY AFFECT AND CONTROL, AS MEMBERS TO DECIDE A CAPITAL CASE FOR OFFENSES THAT OCCUR ON A MILITARY BASE BUT WHERE THERE IS CONCURRENT JURISDICTION WITH A STATE AUTHORITY.
The convening authority’s power to detail court-martial members under Article 25, UCMJ, is a proper exercise of authority under Congress’ mandate in the Constitution that it make rules for the “Government and Regulation of the land and naval Forces." See U.S. Const, art. I, § 8, cl. 14; Loving, 41 M.J. at 296-97.
ISSUE LXV
APPELLANT WAS DENIED HIS FIFTH AMENDMENT RIGHT TO HAVE HIS CASE PRESENTED TO A GRAND JURY FOR THE RETURN OF AN INDICTMENT.
The appellant was not entitled to the return of a grand jury indictment, but to his full panoply of rights under Article 32, UCMJ, which was intended to substitute for the grand jury procedure. Loving, 41 M.J. at 296-97. The appellant was afforded all such rights. Accordingly, we resolve this issue contrary to his assertion. See also Curtis, 38 M.J. at 532, 546.
*600 ISSUE LXVI
THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS-MARTIAL WHEN HE GRANTED THE TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVENING AUTHORITY’S ARTICLE 25(d) STATUTORY AUTHORITY TO DETAIL MEMBERS OF THE COURT.
Following voir dire, the prosecution exercised its peremptory challenge against one of the members. Athough this issue has been previously considered and found without merit, Curtis, 38 M.J. at 532, 547, we note that it was Congress, not the President, who granted trial counsel a peremptory challenge. Article 41(b)(1), UCMJ. If Congress, after bestowing the power to appoint members on the convening authority in Article 25, UCMJ, then also bestows the right of the trial counsel to exercise a peremptory challenge against one of those members, it was perfectly free to do so. The President’s promulgation of ROM 912(g) in the MCM, which simply reiterates the rights contained in Article 41(b)(1), does not therefore constitute action exceeding his powers to prescribe procedures for courts-martial under Article 36, UCMJ, 10 U.S.C. § 836 (1994).
ISSUE LXVII
THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM VIOLATES THE FIFTH AND EIGHTH AMENDMENTS IN CAPITAL CASES WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE, CONTRARY TO THE DICTATES OF MORGAN v. ILLINOIS, 504 U.S. 719, 112 S.CT. 2222, 119 L.Ed.2d 492 (1992), WHICH AUTHORIZED VOIR DIRE ON A POTENTIAL JUROR’S UNWILLINGNESS TO CONSIDER A LIFE SENTENCE.
This issue has also been resolved against the appellant in Loving, 41 M.J. at 294-95. It need not be discussed further.
ISSUE LXVIII
THE DESIGNATION OF THE SENIOR MEMBER AS THE PRESIDING OFFICER FOR DELIBERATIONS DENIED THE APPELLANT DUE PROCESS OF LAW AND A FAIR AND IMPARTIAL MEMBERS’ CONSIDERATION OF THE EVIDENCE, BY ESTABLISHING THE SENIOR MEMBER’S SUPERIORITY IN AND CONTROL OF THE DELIBERATION PROCESS.
We considered a similar issue in Curtis and rejected it. 38 M.J. at 532, 548. The appellant has not provided any factual support or carried his burden for this assertion. We also note the military judge instructed the members that superiority in rank would not be employed in their deliberations, and the junior member, a staff sergeant, indicated he would not be influenced by grade and would voice his opinion. Simply designating the senior member as the presiding officer does not mean that officer will use his rank to influence or pressure the other members toward conviction and the death sentence.
ISSUE LXIX
THE AGGRAVATING FACTORS ENUMERATED IN R.C.M. 1004(C)(7)(I) AND USED IN APPELLANT’S CASE FAIL TO ADEQUATELY CLARIFY THE FACTORS INVOLVED OR NARROW THE CLASS OF PEOPLE ELIGIBLE FOR THE DEATH PENALTY AND IS THEREFORE INVALID UNDER THE FIFTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
We addressed this question in Issue IIB above. It has been resolved adversely to the appellant in Loving, 41 M.J. at 294, and Curtis, 32 M.J. at 260-67.
*601 ISSUE LXX
THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING FACTORS TO “SUBSTANTIALLY OUTWEIGH” EXTENUATING AND MITIGATING CIRCUMSTANCES IS UNCONSTITUTIONAL; THE ONLY ACCEPTABLE STANDARD MUST BE THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING CIRCUMSTANCES “BEYOND A REASONABLE DOUBT.”
Citing notions of fundamental fairness, the appellant asserts in this assignment of error that, as a matter of due process, the members must find that the extenuating and mitigating circumstances are outweighed by the aggravating circumstances beyond a reasonable doubt.
We decline to adopt such a standard. First, the Supreme Court has never stated that a “beyond a reasonable doubt” standard is required in determining whether a death penalty should be imposed. Statutes have been upheld if they focus attention on the particular circumstances of the crime and the offender to ensure that the death penalty is not imposed in an arbitrary and capricious manner. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It has also been held expressly that the Constitution does not require a “beyond a reasonable doubt” standard in the weighing process before a death sentence is imposed. State v. Cohen, 604 A.2d 846 (Del.1992).
Second, the death sentencing procedure in the military provides adequate guidance and adequately channels the members’ discretion. Curtis, 32 M.J. 252, 268. In fact, RCM 1004 is more specific than many state statutes. Id The existing standard that the members, in order to impose the death penalty, must find the extenuating and mitigating circumstances substantially outweighed by the aggravating circumstances sufficiently protects accuseds. RCM 1004 complies with due process requirements. Id at 269.
ISSUE LXXI
THE FINDINGS MUST STATE EXPLICITLY THAT ALL MEMBERS CONCUR THAT ANY EXTENUATING OR MITIGATING CIRCUMSTANCES ARE SUBSTANTIALLY OUTWEIGHED BY THE AGGRAVATING FACTORS [sic] FOUND BY THE MEMBERS.
We resolve this issue against the appellant because our superior Court in Curtis has previously considered and rejected this argument. 32 M.J. at 269. Rule for Courts-Martial 1004(b)(8) requires the president of the court-martial to announce only which aggravating factors were found by the members. There is no requirement to announce specifically that the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances. It was covered adequately by the instructions in this case.
ISSUE LXXII
R.C.M. 1004 IS UNCONSTITUTIONAL UNDER THE FIFTH AND EIGHTH AMENDMENTS AND VIOLATES ARTICLE 55, U.C.M.J., 10 U.S.C. § 855, BY NOT REQUIRING THAT SENTENCING PROCEDURES BE MORE DETAILED AND SPECIFIC TO ALLOW A RATIONAL UNDERSTANDING BY THE MILITARY JUDGE AND CONVENING AUTHORITY AS TO THE STANDARDS USED BY THE SENTENCING AUTHORITY.
In this issue, the appellant notes that the military judge did not provide the court members with a worksheet to record mitigating “factors.” He argues that as a result, reviewing authorities are left with insufficient information upon which to determine whether the members acted inappropriately in deciding on the death penalty.
We reject this argument for several reasons. At trial, the defense never requested that the sentencing worksheet include a section for the members to record specific miti *602 gating circumstances or for the military judge to instruct them to make such a finding. Therefore, the matter was waived. RCM 1005(f). While the appellant argues that they should have been instructed to record mitigating factors, the proper term would be mitigating circumstances. Members are not limited to consideration of any specific mitigating evidence in a capital sentencing determination, but are given maximum leeway to consider any kind of mitigating or extenuating evidence that is offered. The weighing of mitigating and aggravating circumstances is a matter that is left to proper instructions by the military judge, and in this case, he meticulously listed the mitigating circumstances. There is no requirement to list mitigating circumstances in the sentencing worksheet. Therefore this issue lacks merit. See Curtis, 38 M.J. at 532, 550.
ISSUE LXXIII
APPELLANT HAS BEEN DENIED THE EQUAL PROTECTION OF THE LAWS IN VIOLATION OF THE FIFTH AMENDMENT IN THAT ALL OTHER CITIZENS IN THE UNITED STATES ARE AFFORDED THE OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF ARMED FORCES OF THE UNITED STATES BY VIRTUE OF THEIR STATUS ARE DENIED SUCH REVIEW.
We find no merit in this issue for the reasons stated in Loving, 41 M.J. at 295-96. We also agree with the Government’s argument that the appellant has not been denied equal protection because Congress, pursuant to its Article I power to make rules for the government and regulation of the land and naval forces, has enacted the UCMJ which directs the Judge Advocate General to establish this Court to hear appeals such as the appellant’s. Article 66(a), UCMJ; see also Weiss v. United States, 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).
ISSUE LXXIV
DUE PROCESS AND ARTICLE 66 REQUIRE THIS COURT TO REVIEW ALL CAPITAL CASES IN FAVOREM VITAE SINCE CAPITAL LITIGATION IS IN ITS INFANCY IN THE MILITARY JUSTICE SYSTEM AND TRIAL AND APPELLATE DEFENSE COUNSEL LACK THE TRAINING AND EXPERIENCE NECESSARY TO PRESERVE THE RECORD ON ALL ISSUES AND PREVENT APPLICATION OF WAIVER.
This issue was specifically rejected by our superior Court in Loving, 41 M.J. at 266.
ISSUE LXXV
THE SYSTEM OF CAPITAL DEFENSE COUNSEL IN THE MILITARY IS INADEQUATE TO SERVE THE NEEDS OF A DEATH SENTENCED ACCUSED SUCH AS APPELLANT IN THAT THE MILITARY JUSTICE SYSTEM CANNOT PROVIDE ADEQUATE CONTINUITY OF COUNSEL OR ENSURE CONFLICT FREE COUNSEL AS IS EVIDENCED IN THIS CASE.
In Loving, the Court addressed this issue and found no error due to continuity or conflict problems. 41 M.J. at 298-99. We reach the same conclusion in this case. The appellant was defended at his court-martial by the same two counsel throughout. Since his case arrived before this Court on appeal in 1989, he has been represented by only two lead appellate defense counsel. We hardly see this as raising a continuity problem. We have found that appellant’s trial defense counsel defended him competently. Likewise on appeal, his counsel have represented him with thoroughness and undiminished vigor. Therefore, we find no prejudice to this appellant based on a lack of continuity of counsel.
We also have discovered no conflicts of interest between counsel and their represen *603 tation of the appellant. Any possible conflicts have been resolved and lead appellate defense counsel has remained on the case. Cf. Thomas, No. 89 1289 (N.M.Ct.Crim.App. 1 June 1995) (order denying request by appellate defense counsel to withdraw due to conflict of interest).
ISSUE LXXVI
APPELLANT’S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT’S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CAPITAL REFERRAL SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER, AND BECAUSE R.C.M. 1004 DOES NOT PROVIDE A MEANINGFUL BASIS FOR DISTINGUISHING THIS CASE FROM OTHERS REFERRED CAPITAL WHICH DID NOT RESULT IN A SENTENCE OF DEATH.
In this assignment of error, the appellant objects to the discretion the convening authority exercises in deciding whether to refer a case to court-martial as capital or non-capital. The appellant acknowledges that in civilian practice, the Supreme Court has been willing to give deference to the decision made by the prosecution of whether to pursue the death penalty. McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).
Discretion is a part of every criminal justice system. District attorneys and military convening authorities exercise this discretion in every case to decide whether to prosecute, what charges to bring, and the level of tribunal. In the military, before making the decision on a capital referral, the convening authority has the benefit of receiving the recommendation of the Article 32 investigating officer and the advice of the staff judge advocate under Article 34. We believe these steps are adequate to avoid the arbitrary and capricious actions the appellant fears. In the absence of exceptionally clear proof, courts will not infer that such discretion was abused. Id. Here such proof is lacking, and we find no merit in the appellant’s argument.
ISSUE LXXVII
THE LACK OF AN INDEPENDENT DEFENSE COMMAND IN THE NAVAL JUSTICE SYSTEM CONSTITUTED IMPROPER COMMAND INFLUENCE IN THAT IT DEPRIVED APPELLANT OF DUE PROCESS OF LAW AT TRIAL AND ON APPEAL.
There is no evidence in the record that the appellant’s right to counsel was affected by improper command influence or that his right to due process was affected. Major Renner appointed herself as detailed counsel, and the appellant requested and obtained Major Stevens as individual military counsel. He released his civilian attorney following the Article 32 investigation. We have found that both counsel represented the appellant effectively and within constitutional requirements. The fact that appellant alleges the lack of an independent defense command in the naval service does not raise the issues of illegal command influence or due process, particularly where at the time of trial, the Marine Corps defense bar operated under a separate fitness report chain, thereby ensuring independence. See Marine Corps Order 5800.11A of 15 November 1985; subj: Organization of Defense Counsel in the Marine Corps, para 10 at 7-8. We therefore resolve this issue against the appellant.
ISSUE LXXVTII
EXECUTION BY LETHAL INJECTION CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF ARTICLE 55 OF THE UNIFORM CODE OF MILITARY JUSTICE AND THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
We find no merit in this assignment of error. Woolls v. McCotter, 798 F.2d 695, 698 (5th Cir.), cert, denied, 478 U.S. 1031, 107 S.Ct. 15, 92 L.Ed.2d 769 (1986); State v. Moen, 309 Or. 45, 786 P.2d 111, 143 (1990). Death by lethal injection does not involve unnecessary or wanton infliction of pain and does not offend our society’s evolving standards of decency. See Trop v. Dulles, 356 *604 U.S. 86 (1958). It is not cruel and unusual punishment.
ISSUE LXXIX
THE JUDGE ADVOCATE GENERAL OF THE NAVY’S PREPARATION OF THE NAVY-MARINE CORPS COURT OF MILITARY REVIEW JUDGES’ FITNESS REPORTS DEPRIVES THIS COURT OF ITS INDEPENDENCE AND THE APPEARANCE OF INDEPENDENCE.
The fact that the Judge Advocate General prepares and signs the fitness reports of the judges of this Court does not deprive us of our independence or the appearance thereof. United States v. Mitchell, 39 M.J. 131 (C.M.A), cert, denied, — U.S. -, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994); see also Weiss, 510 U.S. at---, 114 S.Ct. at 760-61 (1994).
ISSUE LXXX
THIS COURT SHOULD INQUIRE AS TO THE IDENTITY AND PRACTICE OF THE AUTHORITY WHO DETAILED APPELLATE DEFENSE COUNSEL TO ENSURE THAT COUNSEL WERE QUALIFIED IN TRAINING AND IN EXPERIENCE TO DEFEND A CAPITAL CASE.
While not phrased as an alleged error, the request of the appellant that we inquire as to the authority who detailed appellate counsel is denied. Article 70, UCMJ, governs the appointment of appellate counsel and provides that the Judge Advocate General details such counsel. 10 U.S.C. § 870 (1994). Appellate counsel are qualified under Article 27(b), UCMJ, 10 U.S.C. § 827(b) (1994), and may represent accuseds before this Court. As we have stated previously, the law requires nothing more. Loving, 41 M.J. at 300.
ISSUE LXXXI
THE COURT OF MILITARY REVIEW AS A FACT-FINDING BODY MUST UNANIMOUSLY AGREE ON BOTH FINDINGS OF GUILT AND THE SENTENCE IN A CAPITAL CASE AND MUST APPLY A POLICY OF IN FAVOREM VITAE.
We have previously rejected the in favorem vitae approach to capital cases. See Issue LXXIV, supra. We also hold there is no legal basis for the appellant’s argument that we, as an appellate tribunal, must unanimously agree on the findings and sentence, even though we possess fact-finding power under Article 66, UCMJ. Neither the Constitution, the Code, nor the MCM requires our unanimity on these issues. Had any of the authors of any one of these documents considered unanimity necessary for appellate decision making by this Court in death penalty cases, they could have imposed such a requirement, but they have not.
ISSUE LXXXII
DUE TO INHERENT FLAWS IN THE MILITARY JUSTICE SYSTEM, THE DEATH PENALTY VIOLATES THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT UNDER ALL CIRCUMSTANCES.
In this assignment of error, the appellant reiterates the arguments made in Issues II, LXX, LXXV, LXXVI, LXXVIII, LXXIX, and LXXX and combines them into a type of cumulative error asserting that, together, those issues render the death penalty in the military cruel and unusual. For the reasons we have already stated in addressing those issues, we find no merit in this amalgam.
ISSUE LXXXIII
THE NUMEROUS ERRORS WHICH OCCURRED DURING THE SENTENCING PHASE OF APPELLANT’S COURT-MARTIAL CANNOT BE FOUND HARMLESS BEYOND A REASONABLE DOUBT WHEN CONSIDERED COLLECTIVELY.
The appellant next asserts the cumulative error during the sentencing hearing, involving alleged ineffectiveness of counsel and instructional error, warrant relief. We disagree. We have found counsel were not ineffective under Strickland, and the military judge did not err to the prejudice of the appellant in his instructions. There is no cumulative error.
*605 ISSUE LXXXIV
APPELLANT HAS BEEN PREJUDICED IN THAT CASES IN WHICH OFFENDERS WITH AN APPROVED DEATH SENTENCE ARE INELIGIBLE FOR CLEMENCY BY THE NAVY CLEMENCY AND PAROLE BOARD, WHILE ALL OTHER CASES REVIEWED BY THIS COURT ARE ELIGIBLE FOR SUCH CONSIDERATION.
The Department of Defense directs each service secretary to establish a Clemency and Parole Board. This board is established to consider eligible military prisoners for clemency, parole, restoration to duty, and reenlistment. Department of Defense Directive 1325.4 of 19 May 1988; subj: Confinement of Military Prisoners and Administration of Military Correctional Programs and Facilities, [DOD Dir 1325.4], end. 1, § J2 at 1-8; see also UCMJ arts. 52-53, 10 U.S.C. §§ 852-853 (1994). The directive lists two classes of prisoners who are not eligible for consideration by the board: those sentenced to less than 12 months confinement and those sentenced to death. See DOD Dir 1325.4, end. 1, § J3a at 1-9. The directive has been implemented for the Navy by Secretary of the Navy Instruction 5815.3H, which lists the penalty of death as not within the jurisdiction of the Navy Clemency and Parole Board. Secretary of the Navy Instruction 5815.3H of 5 Oct 1993; subj: Department of the Navy Clemency and Parole Systems, Part III, § 305d.
The appellant asserts that, because of his death sentence, he has been prejudiced by his exdusion from consideration by the Navy Clemency and Parole Board. He argues that he should receive consideration by the board, particularly because he has been sentenced to the ultimate punishment. He requests that we either reduce his sentence to life imprisonment or order the Navy Clemency and Parole Board to review his case.
What the appellant’s argument has failed to mention is that his sentence, if affirmed on appellate review, must be approved by the President of the United States before it may be executed. Article 71(a), UCMJ, 10 U.S.C. § 871(a) (1994); RCM 1207. In cases involving a death sentence, Congress granted the President the authority to commute, remit, or suspend all or any part of the sentence, except that he cannot suspend a death sentence. Therefore, by virtue of Article 71(a), the appellant is entitled to a greater right of review because of his sentence. We have determined that he has not been prejudiced by a lack of Navy Clemency and Parole Board consideration, and he is entitled to no relief. Moreover, we doubt that we would have any power under Article 66 to direct the Navy Clemency and Parole Board to review this case. Cf. United States v. Brown, 40 M.J. 625 (N.M.C.M.R.1994); United States v. Bledsoe, 39 M.J. 691 (N.M.C.M.R.1993), aff'd, 40 M.J. 292 (C.M.A.1994) (summary disposition).
ISSUE LXXXV
THE MILITARY JUDGE ERRED TO APPELLANT’S SUBSTANTIAL PREJUDICE BY COMPELLING MITCHEAL N. NELSON TO TESTIFY IN VIOLATION OF NELSON’S PRIVILEGE AGAINST SELF-INCRIMINATION.
As described above, the convening authority issued a grant of immunity to Mr. Nelson when Nelson was on active duty in the Marine Corps. Nelson then testified at the appellant’s Article 32 pretrial investigation. By the time he was called to testify at the appellant’s court-martial, however, Nelson had been discharged to civilian status. When asked to testify, he was uncertain whether the immunity grant, which was given to him as an active duty Marine, was still valid when he testified as a civilian. His testimony obviously incriminated him in the murder of Melinda Thomas, at least as an accessory-after-the-fact.
Initially, Nelson balked at testifying until he could consult with civilian counsel. The military judge ordered him to testify. Nelson still refused. The military judge then told the trial counsel to pursue the matter “with the Federal jurisdiction.” Following an overnight recess, Nelson returned to court and testified the next day for the prosecution. The appellant now argues the military judge erred to his prejudice by ordering Nelson to testify. He states that such an *606 order violated Nelson’s right against self-incrimination.
We hold that the military judge’s ruling was correct under Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Even though Nelson’s grant of immunity was processed and delivered to him while on active duty, once he testified at the pretrial investigation under the grant of immunity, his later change to civilian status did not allow either the State of California or the Federal Government to use that testimony against him. Also, his protection under the grant of immunity did not end when he testified at the court-martial. Federal and state authorities would still be barred from prosecuting him for the murder based on his testimony or the fruits thereof. Murphy, 378 U.S. at 77-78, 84 S.Ct. at 1608-09. As a result, Nelson could be compelled to testify. We also believe the appellant cannot be heard to complain even if Nelson decided to incriminate himself without a valid grant of immunity. At a later prosecution, it would be Nelson’s right to assert the immunity defense at his trial, not the appellant’s.
ISSUE LXXXVI
R.C.M. 1004 VIOLATES APPELLANT’S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION BY FAILING TO REQUIRE TWELVE MEMBERS IN CAPITAL COURTS-MARTIAL.
We resolve this issue against the appellant because it has been decided adversely to his contention. Loving, 41 M.J. at 287; Curtis, 32 M.J. at 267-68.
ISSUE LXXXVTI
TRIAL DEFENSE COUNSEL IMPROPERLY DEPRIVED SERGEANT THOMAS OF HIS FUNDAMENTAL RIGHT TO TESTIFY.
The appellant has withdrawn this assignment of error and the Government has not briefed it. We deem it appropriate, nonetheless, to summarize the facts which lead to the defense’s withdrawal of the issue and why we acted as we did regarding it.
The appellant included in his brief the above assignment of error alleging that trial defense counsel had “improperly deprived” the appellant of his right to testify at his court-martial. The appellant supported his allegation with his own affidavit and that of Mr. Hammer that indicated Major Stevens told the appellant that he (Stevens) was the lawyer, that he would handle things, and appellant should shut up. The appellant states that if he had been allowed to testify, he would have testified as indicated in his March 1989 affidavit.
In the course of preparing its reply brief, the Government obtained the affidavits of Majors Stevens and Renner. On the this question, Major Stevens stated:
Sgt. Thomas was never ordered not to testify. There were several discussions between myself, Major Renner and Sgt. Thomas on this subject. It is fair to say that Sgt. Thomas wanted to testify. Both myself and Major Renner advised him against it. We saw blatant inconsistencies in his story and felt that he would not do well on cross-examination. In addition, I had an ethical problem in letting him testify. We persuaded him that it was not in his best interest to testify.
Major Stevens Aff. of 9 November 1994, at 3. Concerning the “ethical dilemma” that would have forced him to withdraw from the case if the appellant testified in accordance with his March 1989 affidavit, Major Stevens stated:
This is the first time I’ve heard the version in Sgt. Thomas’ statement of 23 March 1989. The government would have destroyed this story with contradictory evidence. I told Sgt. Thomas that if he insisted on testifying that I would ask the military judge to be relieved from the case. I further informed him that if the military judge did not relieve me, I would not argue the facts as they came out in his testimony. I have no further comment on this matter.
Id. at 4.
Major Renner had the following to say about the decision for the appellant not to testify:
The first time I ever heard the version of events contained in Thomas’s March *607 1989 sworn statement was when the case was already on appeal and I was contacted by the appellate defense counsel.
Over the months of pretrial preparation, the topic of Thomas testifying was discussed at length. I am also aware that there were several conversations between Lt. Col [sic] Stevens and Thomas concerning this topic where I was not present. The decision not to testify was strictly Thomas’s. I never gave Thomas an order not to testify, and I did not hear Lt. Col Stevens give Thomas such an order. I remember a conversation that lasted at least an hour at the Camp Pendleton Base Brig between Thomas, Stevens and myself the weekend after the government rested it’s [sic] case. We informed Thomas of our assessment of the government’s case at that point, and told him the pros and cons of testifying. I knew that the government had at least 50 rebuttal witnesses lined up to testify concerning Thomas’s lack of truthfulness, and told him how this would impact upon the case. We discussed the cross examination by the government and the risks associated with that. We also discussed an ethical consideration, if Thomas testified. I decline to give further details about this absent a court order, since I am uncertain if the attorney-client privilege has been waived with regard to this issue.
Both LtCol. Stevens and I throughout the trial discussed the issue of testifying with Thomas, and gave him our strong recommendation that he should not testify.
Major Renner Aff. of 9 November 1994, at 5-6.
On 15 November 1994, the Government filed a motion with the Court “To Compel Sworn Answers to Interrogatories.” In this motion, the Government proposed various additional questions for Major Stevens and Major Renner regarding what they had referred to as their “ethical problem” and “ethical consideration” in the appellant testifying. The Government specifically wanted to inquire whether the concern was that counsel believed the appellant would have perjured himself.
After considering the motion and the appellant’s reply, on 6 December 1994, we granted the Government’s motion by requiring both counsel to provide all of their reasons for recommending the appellant not testify, including a thorough discussion of their perceived ethical dilemma. We based this order on our rationale that, by attacking his counsel’s conduct in this matter, the appellant had waived his attorney-client privilege as to matters reasonably related to the issue. United States v. Dupas, 14 M.J. 28, 30 (C.M.A.1982); see also Lewis, 42 M.J. at 5.
The appellant requested reconsideration of our order and, in the alternative, leave to withdraw the issue. We then inquired of the defense team whether the appellant personally knew of the proposed withdrawal of the issue and if he concurred in it. The defense replied as follows:
Appellant does not wish to withdraw assignment of error LXXXVII. Appellant also does not wish to have his trial defense counsel forced to disclose confidential information which is not relevant to any of Appellant’s assignments of error.
Appellant believes that this Court should vacate its order of 6 December 1994, directing Appellant’s tidal defense counsel to provide sworn answers to Government interrogatories. If this Court chooses not to vacate its order, however, Appellant believes that it is the lesser of two evils for him to request “for the sole and express purpose of mooting this Court’s order ... that this Court Allow him to withdraw Assignment of Error LXXXVII.”
Appellant has knowledge of the motion to withdraw assignment of error LXXXVII, and approves of it under these limited circumstances. Rather than have the Government allowed access to privileged attorney-client information, Appellant would reluctantly consent to the withdrawal of the assignment of error thus mooting the Court order of 6 December 1994.
On 10 January 1995, we denied the request for reconsideration, granted the motion to withdraw the assignment of error, and vacated our 6 December 1994 order.
*608 An appellant’s claim that his trial defense counsel would not allow him to testify is a claim of ineffective assistance of counsel. United States v. Teague, 953 F.2d 1525 (11th Cir.) (en banc), cert, denied, 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992). It may also amount to misconduct by counsel. A criminal defendant has a constitutional right to testify in his own defense. United States v. Belizaire, 24 M.J. 183, 184 (C.M.A.), cert, denied, 484 U.S. 899, 108 S.Ct. 235, 98 L.Ed.2d 193 (1987). However, the right to testify is not unlimited and does not include the right to commit perjury. Nix v. White-side, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Additionally, a claim of ineffective assistance of counsel waives the attorney-client privilege as to matters reasonably related to the claim. Lewis, 42 M.J. at 6; Dupas, 14 M.J. at 30. The reasons Major Stevens and Major Renner had for recommending the appellant not testify were reasonably related to the appellant’s claim that they did not allow him to testify. We could not have decided the issue without this information.
The appellant’s reply position amounted to unacceptable gamesmanship. He could not have it both ways. On the one hand, he could not attempt to prevent his counsel from answering our order and, on the other, maintain his ineffective assistance of counsel claim. His request to withdraw the issue was a suitable resolution to the matter.
ISSUE LXXXVIII
THE GOVERNMENT FAILED TO PROVIDE THE DEFENSE NOTICE OF AN AGGRAVATING FACTOR AS REQUIRED BY R.C.M. 1004(b)(1) WHEN THE TRIAL COUNSEL IMPLICITLY PRESENTED TO THE MEMBERS THE R.C.M. 1004(c)(4) AGGRAVATING FACTOR THAT APPELLANT HAD COMMITTED THE OFFENSE IN A WAY WHICH ENDANGERED THE LIVES OF PEOPLE OTHER THAN THE VICTIM SUCH AS THE FETUS BORNE BY MELINDA THOMAS AND WHEN THE TRIAL COUNSEL EXPLICITLY ARGUED THE R.C.M. 1004(c)(7)(D) “MURDER FOR HIRE” AGGRAVATOR.
The trial counsel did not implicitly present Melinda’s pregnancy as an aggravating factor that the appellant committed the murder in a way to endanger the lives of others (arguably the fetus she carried). The prosecution presented evidence that Melinda was pregnant for several reasons, including her identification, that her happiness of her pregnancy would make suicide unlikely, that the reading of the x-rays was accurate, and to prove premeditation. We agree with the Government that had the prosecution considered the fetus a person for the purpose of the aggravator, it would have been logical to have charged the appellant separately for the murder of the unborn fetus. That was not done. Finally, we have reviewed trial counsel’s argument on sentence, and we have concluded that he did not argue that Melinda’s murder put the fetus in grave risk of death. Rather, it pointed to a relevant circumstance in the case of the violent breach of the marital relationship appellant committed.
Also, the prosecution did not explicitly present the “murder for hire” aggravator. The appellant’s solicitation to Nelson to help dispose of the body in exchange for $10,000 of the life insurance proceeds would not have established the “murder for hire” aggravator beyond a reasonable doubt. At most, he may have acted as an accessory after the fact. The trial counsel used this evidence to prove the appellant’s guilt, and he never argued it on sentencing. The “murder for hire” aggravator was not raised in this case. We also note that the appellant never objected to these matters at trial or claimed that he had been misled. Therefore, the issue was waived as well.
ISSUE LXXXIX
THE COURT’S ATTENTION IS RESPECTFULLY INVITED TO ATTACHMENTS #1-4 WHICH HAVE BEEN SUBMITTED BY THE APPELLANT PURSUANT TO UNITED STATES v. GROSTEFON, 12 M.J. 431 (C.M.A.1982).
We have carefully read and considered all of the matters submitted by the appellant pursuant to Grostefon. We have also found *609 the issues raised in those attachments to be without merit.
Accordingly, the findings and sentence are affirmed.
Chief Judge LARSON, Senior Judge WELCH, and Judge KEATING concur.